**Leon A. CHENEY, Petitioner,**

v.

**DEPARTMENT OF JUSTICE, Respondent.**

**Appeal No. 83–751.**

United States Court of Appeals, Federal Circuit.

Nov. 9, 1983.

Keith E. Farr, Waco, Tex., for petitioner.

Sharon Y. Eubanks, Washington, D.C., for respondent. J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Director, Thomas W. Petersen and Randall B. Weill, Washington, D.C., were on the brief for respondent.

Before RICH and DAVIS, Circuit Judges, and NICHOLS, Senior Circuit Judge.

NICHOLS, Senior Circuit Judge.

This is a former government employee's appeal from a decision of the Merit Systems Protection Board (MSPB) which affirmed petitioner Cheney's dismissal from employment as a Deputy United States Marshal. The only serious issue is whether the dismissal is invalid because of harmful error in application of the agency's procedures, before the case ever reached the MSPB. 5 U.S.C. § 7701(c)(2)(A). We agree with the MSPB that there occurred no harmful error and we therefore *affirm*.

I

*Facts*

Mr. Cheney served in the Western District of Texas under United States Marshal Rudy Garza, and was of 10 or 12 years standing. On April 17, 1981, he engaged in a series of acts which led to the removal action. The testimony was sharply conflicting; however, the MSPB presiding official believed and found that he forced his way into the home of one David Waechter, gun in hand, though this was in no way an official mission, but resulted from a private family quarrel. He struck Mr. Waechter with the gun butt, threatened and intimidated him, and smashed up his property. He said he was a federal marshal, accused Mr. Waechter of being a drug pusher, and said he could "waste" him if he wanted and obtain impunity by the assertion he was on a drug action. Seeking to placate appellant, Mr. Waechter telephoned a Mr. Claiborne, known to both as a law enforcement officer, and asked petitioner to speak to him, which petitioner did and stated he was on a narcotic investigation, which he afterwards admitted he was not. There was much more testimony, but the above suffices to set the stage and pose the issue we have to decide.

Mr. Garza testified that, being Mr. Cheney's supervisor, he received from headquarters an "appointment" or designation to be "deciding official" in the matter of charges against Mr. Cheney, proposed by headquarters. He investigated the facts by reading the file consisting of investigative reports and witness statements and had more investigation made. He was aware that a grand jury investigation resulted in a no bill, and accepted some responsibility for causing this to happen. Mr. Cheney being served with the agency charges, Mr. Garza received the written reply and discussed the case further with Mr. Cheney. He came to a decision "not to terminate him. I suggested that he be given maybe two or three months suspension without pay." He communicated his conclusions to the headquarters of the Marshal Service, discussing the case with eight named persons, including the Mr. Mead who figures further in the case as we shall see. These were telephone conversations and resulted in disagreement since those at headquarters wanted Mr. Cheney terminated.

Mr. Garza had no instructions to conduct an adversary or trial-type hearing, and none was contemplated in the agency procedures. His conclusion was not, as has been assumed or asserted in this case, that the facts as charged were established but that the penalty of removal was excessive. Mr. Garza never made any written report, so far as the record shows, and when he testified before the MSPB, he did not explain much but his ultimate conclusion, except his comparison of the case with that of another erring marshal who was not removed. Yet he did not feel the misconduct was fully sustained, only that "I think something occurred."

Q. * * * Nobody has established to your mind, have they, that Mr. Waechter was hit by Mr. Cheney with a gun?

A. That's correct.

The frequent conversations with headquarters should have been the means for Mr. Garza's communicating all the reasons for his conclusion, and he testified he did so. He did not suggest that he was prevented from making any point favorable to Mr. Cheney or that written findings by him would have provided headquarters with information he did not submit orally. He simply was confronted with an adamant determination by headquarters—which had the same information he himself had—that Mr. Cheney must be removed. He declined to lend his name to a decision that did not agree with his own convictions.

Mr. Garza ultimately received a new directive superseding him by Mr. Mead as "deciding officer," and telling Mr. Cheney to resubmit his reply to Mr. Mead. Mr. Cheney elected to stand on what he had submitted to Mr. Garza.

Mr. Mead was stationed at agency headquarters, McLean, Virginia, and was the Assistant Director for Administration. He was responsible for personnel including adverse actions. His position had at one time been called Assistant to the Associate Director for Administration, and reference in the Marshal's Manual (which was in evidence) to the latter named position referred to him. It is undisputed that he was in charge of the adverse action against Mr. Cheney.

The manual includes the following provisions:

*Responsibilities*

6. * * *

b. *The Assistant to the Associate Director for Administration* is responsible for deciding on disciplinary actions taken under the authority of 5 C.F.R. 752(B), except as noted above and for periodically reviewing the effectiveness of the disciplinary program and publishing an annual report thereon by August 1 of each year.

* * * * * *

*Formal Disciplinary Action Guidelines*

9. Formal disciplinary actions consist of official reprimands, suspensions, demotions, and removals. Although formal disciplinary actions are to be initiated by a Marshal or staff officer, such actions may not be accomplished without concurrence of the Personnel Management and Training Division. * * *

c. *Notice of Proposed Suspension of more than 30 days, Removal or Demotion.*

* * * * * *

(2) *Consideration of Employee's Reply and Hearing Information.* The employee's reply/hearing report will be considered by the Assistant to the Associate Director for Administration. The reply/hearing report may contain denials or other evidence which contradicts the charges or lessens their seriousness. Therefore, the reply/hearing report must be given detailed and objective consideration. If there is conflicting evidence, a decision as to whether to modify, to withdraw, or to take the action as proposed depends upon the preponderance of creditable evidence. In no case may the decision to take the action be based on charges not stated in the proposed notice.

d. *Notice of Final Decision.* The notice of final decision will be prepared for the signature of the Assistant to the

Associate Director for Administration. * * *

While these provisions assign a role to the United States Marshal of a district such as Mr. Garza was, in initiating a removal of a deputy marshal in his district, it is clear that final action on the charges is for the Assistant Director, then Mr. Mead. The position of "deciding official," to which Mr. Garza considered himself appointed, is unknown to the manual. It appears he would, if headquarters approved, have prepared and signed a notice to Mr. Cheney of a two or three month suspension.

The original letter of charges did not call Mr. Garza "deciding official," but simply stated that Mr. Cheney's oral or written report should be submitted to him. However, the letter substituting Mr. Mead said that Mr. Garza was removed as "deciding official." Mr. Mead's testimony refers to that position, but says he retained final authority in himself. Mr. Mead signed the final removal notice, advising Mr. Cheney he could appeal to the MSPB.

The MSPB, in general, after a trial-type hearing, supported the agency action in every way. Nothing occurred before the MSPB that requires special notice since our concern is with agency procedures.

The difficulty with the case is due to the agency having created at some point a role in adverse actions for a person called "deciding official" but failed to amend the manual to conform to actual practice. However, it seems uncontested (except by the dissent) that a "deciding official" other than Mr. Mead, if designated, could not dispose of the case one way or the other without Mr. Mead's approval, as Mr. Mead testified. Mr. Garza had thought that as "deciding official" he could make a final disposition of the charges, but in view of what happened in this case, he was unsure, whereas Mr. Mead was very sure. Petitioner called Mr. Garza as his witness, but did not develop any basis for Mr. Garza's subjective belief. If it had been correct, he must have received some sort of oral or written delegation of authority of whose existence there is no showing in the record.

Mr. Garza's efforts to obtain headquarters approval before he acted, suggest plainly his belief that approval was needed if his decision were to be effective.

II

*Discussion*

The issue we are to decide breaks down into first, whether the United States Marshal Service violated constitutional due process or its own internal regulations or both by revoking a "deciding official's" authority only after he had received all the evidence he was going to receive, arrived at his decision, and communicated it orally to numerous headquarters personnel. This may seem intrinsically unfair, at least on paper. That is, an accused employee may labor to convince a "deciding official" before whom he stands, and make an exceptionally favorable impression, which he could not reproduce another time. The story may become a little shopworn if it has to be repeated to another, while the benefit of the favorable personal impression may be wholly lost if the new "deciding official" is stationed at a distance and insulated from the effects of personal contact. It is a "heads I win, tails you lose" proposition in that, of course, the distant official would not have seriously considered removing the "deciding official" if the latter had been wholly unimpressed by Mr. Cheney's defense. This standard of fairness is not absolute as, of course, occasions arise when a "deciding official" or judge has got his teeth into a case and yet must be withdrawn because of some unavoidable cause such as his suffering a stroke. These unfortunate instances are not to be multiplied when unnecessary. However, it is held in *Depte v. United States,* 715 F.2d 1481 (Fed. Cir.1983), that when a due process hearing is provided later, as here before the MSPB, the accused employee is entitled within the agency only to procedures mandated by statute or regulation. It cannot be said that any statute or regulation is violated by the change. Some procedural irregularities are held to be so grossly unfair that they violate the Constitution even if not express-

ly prohibited, for example, prehearing *ex parte* approaches by an adverse party to a deciding official who might, but for the approach, have disposed of the charges without more being required of the employee. *E.g., Camero v. United States,* 375 F.2d 777, 179 Ct.Cl. 520 (1967).

On the whole, we find the question of procedural error difficult to resolve. We would be unable to assure the Marshal Service that the disarray in its adverse action procedural regulations, with the apparent unfairness of removing a "deciding official" after he has already arrived at his conclusions, could not eventuate in one of those unfortunate cases so common under former Civil Service law, where an agency having good cause for removal of an erring employee, could get so tangled up in its own procedural regulations that the outcome was legal error and a court order reinstating the employee and awarding him back pay. What averts that outcome here is the attention mandated by the present statute to the harmfulness of the error.

Second, under the peculiar facts of this case, the error, if any, was harmless. One peculiar fact is that Mr. Garza never could have made any disposition of the case without the approval of Mr. Mead. (Courts do not hold that a government official has authority to bind the government on the basis of the official's subjective belief.) The other is that Mr. Garza in substance gave Mr. Cheney as much benefit by communicating his views to agency headquarters, as he did, in telephone calls and interviews, as he could have done by writing out findings and conclusions and having them disapproved. He admitted in testimony that he expressed his own ideas fully. Whether the agency procedures are those described in the manual, or the different ones described by Mr. Garza and Mr. Mead in their testimony, the result is the same. Under the manual procedures, Mr. Garza would have had to prepare a decision for Mr. Mead's signature. Under the testified procedure, Mr. Garza could have written a decision to be signed by himself, but could not have put it in effect except after getting Mr. Mead's approval evidenced in, we

suppose, one of the traditional governmental ways, either initialing, or endorsed below Mr. Garza's signature on the signature page. There is, of course, ordinarily some difference between submitting a recommended decision to another for signature, and submitting a decision signed by one's self for another's mere approval, but the difference vanishes when the approving officer has independently the same information as the submitting officer, as here, and has equally strong views.

The MSPB opinion reflects that the facts surrounding Mr. Cheney's misconduct were retried practically *de novo,* with the burden on the agency to prove its case, but deference was given to the agency's opinion as to what discipline was necessary to maintain agency "efficiency." What Mr. Garza and Mr. Mead thought about the former class of issues is therefore less significant. As to the latter, clearly the manual contemplated that Mr. Mead should have the deciding voice, and there is nothing to show he ever intended to surrender it by his *de facto* designation of Mr. Garza as "deciding official." Obviously the personnel administration at headquarters needs to modify local determinations to satisfy nationwide policy in view of the fact that the United States Marshal Service is part of the Justice Department and a nationwide organization. If therefore Mr. Mead, and government counsel before us, had been correct in supposing that the difference between Mr. Garza and Mr. Mead resided wholly in the choice of an appropriate penalty, and that both men took the same view of the issues as to Mr. Cheney's misconduct, the impossibility of Mr. Garza ever obtaining acquiescence in his individual approach is even plainer.

What we have is a case where Mr. Mead could have done the thing right, procedurally, in two different ways. He could have all along designated only himself as "deciding official," relegating Mr. Garza to receiving the reply to the charges and making a recommendation. Or else he could have waited for Mr. Garza as "deciding official" to make a decision, and then have disap-

proved it as he had power to do. Either way he could have worked his will and no procedural error would have occurred. But he chose an illegitimate melding of both procedures, and committed an error. For the error to have been harmful, however, it must be shown that the erroneous procedure denied Mr. Cheney some opportunity of avoiding dismissal, however slim, that the correct procedures, one or the other, would have permitted. Such a showing cannot be made. Petitioner made no effort at the MSPB hearing to show how the error was harmful. No finding along that line was made and none could have been.

Petitioner's allegations do not amount to allegations that the substitution was harmful because Mr. Garza possessed full authority to bind the agency and would have exercised it in Mr. Cheney's favor. We see nothing else by petitioner to alert the MSPB that petitioner so claimed. The court is not required to conjure up reasons why a procedure is harmful because of a bald allegation of harmfulness alleging different reasons or none, but the right of the court to do so *sua sponte* is not denied.

### III

### *Decision*

The decision of the MSPB affirming the agency action is affirmed.

AFFIRMED.

DAVIS, Circuit Judge, dissenting.

Contrary to the majority, I consider the Marshals Service's conduct—deliberately changing the deciding official in midstream because of higher level dissatisfaction with that person's determination of the penalty to be imposed on petitioner—was a harmful error vitiating the removal. As I understand it, the majority's position flows entirely from its interpretation of the Marshals Service's Manual as indisputably and

necessarily placing plenary power over the adverse action in Mr. Mead as Assistant Director for Administration. Although that is a possible understanding of the Manual, it is not a necessary one, and I would read the Manual differently, in view of the actual practice, as authorizing delegation of full deciding authority to the deciding official—and in my view that is what appears to have been done here.

### I

What actually happened in this case? The initial letter of charges of July 6, 1981 (though it did not use the term "deciding official") plainly indicated that Marshal Garza would hold that post. Petitioner was told that he had "the right to reply to U.S. Marshal Rudy A. Garza orally, in writing, or both orally and in writing". He was also expressly told: "If you submit a reply, full consideration will be given to it in deciding *whether or not the Marshal will remove you* from your position" (emphasis added). There was no mention in the charge letter of Assistant Director Mead (or his office). The later letter (September 4, 1981), changing the deciding official to Mr. Mead, said "that in the proposed notice of July 6, 1981 U.S. Marshal Rudy Garza *was listed as the deciding official*" and that "the *deciding official* in your case has been changed, and I [Mr. Mead] have been designated as the *deciding official* in this matter" (emphasis added).

At the Merit Systems Protection Board (MSPB) hearing, Marshal Garza testified without contradiction that he fully undertook and performed in the role of *deciding* official until it became clear to headquarters that he would not impose the penalty of removal on petitioner Cheney.[1] He also testified, in response to questions as to his "understanding in past situations",[2] that "[t]hat was not my impression prior to this

---

1. Mr. Mead agreed that he did not alter the designation of the deciding official until he was satisfied that (a) petitioner should be removed, and (b) Marshal Garza would not impose that sanction.

2. "Is it your understanding in past situations that any decision you might take as the deciding official has got to be approved in final form by the headquarters staffing personnel branch?"

incident", *i.e.,* that headquarters approval of his decision was not necessary. Similarly, he testified that he "wasn't aware" that final action cannot be taken without the approval of the Personnel Branch and he was "quite surprised by it", *i.e.,* to learn that his decision was subject to approval. He testified, too, that, before he was removed, he understood that he had the same duties and responsibilities as Mr. Mead when the latter substituted himself. In other words, there is no question on this record that before he was removed Mr. Garza considered himself the full deciding official in every sense.[3] That must also have been the way it appeared to petitioner from the letter of charges he received and from Marshal Garza's actions.

At the MSPB hearing Mr. Mead testified differently. He said that (a) final disciplinary action cannot be taken without the formal approval of the Personnel Branch; (b) "from time to time" he removed deciding officials for bias or for intending to make a decision contrary to policy or the best interests of the Service; and that (c) "The deciding official under our system is only making a recommendation. The final authority rests with me" ... "I have the final decision", but "Not personally in all cases. The Employee Relations Branch exercises my authority in the matter, and if they find the decision proposed by the deciding official, or recommended by the deciding official, to be the best interest of the Service, that decision is made final. If they find that decision is not in the best interest of the Service, they bring it to my attention", and Mr. Mead can and sometimes does remove the deciding official and substitute himself.[4] Accordingly, since Mr. Mead had been alerted to Marshal Garza's proposed sanction and after consideration thought it contrary to the Service's best

interest (fn. 1, *supra*), he removed the Marshal and substituted himself.

It is important that Mr. Mead never testified that his view of the role of the deciding official was well-known throughout the Service or to the public, let alone that it was known to Marshal Garza at the time the latter was initially designated deciding official. Aside from the bare existence of the Manual (to be discussed in Part III, *infra*), the record does not contain anything showing that Mr. Mead's view was or should have been well-known within the Service.

## II

The picture I have sketched in Part I, *supra,* is extraordinary. The petitioner was told, both in effect and in express words, that Marshal Garza was to be his "deciding official"—without qualification. That designation imports, as the charging letter specifically said, that Marshal Garza was to be the one who would or would not "remove you from your position". Marshal Garza fully believed that to be his position. If headquarters happened to agree with the Marshal, he would apparently take the final action and sign the letter of sanction.

However, Mr. Mead and his staff—physically removed from Texas where both Marshal Garza and Cheney were located—believed, to the contrary, that the designated deciding official, literally denominated as such, was merely a recommender despite his title, and that final approval or action would have to be given or taken by headquarters. But there is no showing (aside from the bearing of the Manual) that this headquarters' view was widely understood in the Service. It was not known to Marshal Garza. Apparently, it was unknown to petitioner, nor should it have been known (unless it was *required* by law).[5]

---

**3.** The Merit Systems Protection Board's decision does not take issue with Marshal Garza's testimony as to his understanding of his role and position.

**4.** It is plain from Mr. Mead's testimony that (a) the use of "deciding official" was not special for petitioner's case but was ordinarily used, and (b) in form, the letter of charges sent to

petitioner was the form ordinarily used. It is also clear from that testimony that, if deciding officials were not removed, they appeared to act as *deciding* officials.

**5.** The only pertinent material published in the Code of Federal Regulations did not give any notice of the asserted practice or of the provi-

In these circumstances it seems to me decidedly unfair to accept the "secret" headquarters position—so contrary to the outward manifestations leading to justified expectations—unless some governing provision of law *demanded* it. In the absence of such overriding compulsion, nothing could be more unfair than to remove the accepted *deciding* official (before completion of his task) simply because of the way he intended to decide the particular case.

### III

We are told that the Manual was such a mandatory and controlling provision. I disagree. I do not read it as forbidding full delegation in this case to Marshal Garza as a genuine deciding official.

Four parts of the manual are relied on for the view that all adverse actions had to be taken or approved by Mr. Mead or the Personnel Division (which was a headquarters entity under Mr. Mead). For me, none forbids the delegation here. The first is paragraph 6. b, stating that the Assistant to the Associate Director for Administration (now the Assistant Director) "is responsible for deciding on disciplinary actions". Placing ultimate "responsibility" for "deciding" disciplinary action on the Assistant Director does not necessarily say that he cannot delegate his authority to deciding officials—so long as he retains the power openly to change the system (*not* the individual deciding officer in the particular case) if he decides it is not working properly. "Responsibility" can have that connotation, and does not require that the Assistant Director decide every case.

Paragraph 13. c. (2) declares that the "employee's reply/hearing report will be considered" by the Assistant Director. According to Mr. Mead's testimony, that has *not* been the practice for years, except in the minority of instances where the Assistant Director substitutes himself as deciding official; in the light of that practice, I cannot read the provision as forbidding the delegation.

Paragraph 13. d. says that the "notice of final decision will be prepared for the signature of the 'Assistant Director' ". That, too, has apparently not been the practice for quite a while (if it ever was) except where the Assistant Director is or becomes the denominated "deciding official". Again, the practice persuades me that paragraph 13. d. does not forbid the delegation made here.

The provision of the Manual which gives me most pause is paragraph 9., stating that disciplinary actions may be initiated by a Marshal or staff officer, but "such actions may not be accomplished without concurrence of the Personnel Management and Training Division". Marshal Garza testified that he did confer with personnel of the Division on Cheney's case, and apparently it was the practice to do so. But Garza also indicated (as pointed out above) that he did not believe he needed headquarters' concurrence to impose a *lesser* penalty than the Division wished. In view of the circumstances described in Part I, *supra,* Marshal Garza's position reflects a reasonable interpretation of paragraph 9. The literal wording of paragraph 9—authorizing the field to initiate formal disciplinary proceedings but requiring headquarters Division concurrence for "accomplishment" of disciplinary actions—fits well with the concept that the purpose of such concurrence was to prevent excessive punishment by the deciding official, not to let the Division insist on greater punishment than the deciding official thought necessary. In the present situation, accordingly, full delegation was permissible.

I conclude, therefore, that the Manual did not preclude delegation to Marshal Garza finally to impose the penalty of suspension

sions of the Manual. The Government cites 28 C.F.R. 0.138, but that provision, both as issued July 1, 1980 and as next issued on November 1, 1981, simply delegated to the Director of the Marshals Service the Attorney General's general power (with respect to the Marshals Service)

over personnel administration, including demotion and separation. There is no specific provision relating to the handling of adverse actions, nor anything on subdelegation of adverse action power.

he considered appropriate. On the contrary, in the absence of any such compulsion from the Manual, the circumstances affirmatively dictate the conclusion that Marshal Garza was so appointed.

## IV

On the view I take, there can be no doubt that the agency's error of changing the deciding official *in medias res* was harmful. Petitioner suffered the penalty of removal rather than the suspension that Marshal Garza would (in all probability) have imposed if he had continued, as he should have, as deciding official. The ruling in *Depte v. United States,* 715 F.2d 1481 (Fed. Cir.1983), that agency procedures need not meet due process or fairness standards, where a full *de novo* hearing is held before the MSPB, is inapplicable to matters of penalty. On that question, the board's decision is not *de novo* but gives considerable deference to the employing agency. Here, for instance, the presiding official did not determine the sanction for herself, but merely concluded that the agency did not abuse its discretion or act unreasonably in imposing removal. It follows that the agency error directly affected the board's action; if suspension had been ordered by Marshal Garza, the MSPB could not and would not have increased that sanction.

This error was adequately raised as harmful, not only before the presiding official but also in the petition for review by the full MSPB. That petition expressly referred to the substitution of Mr. Mead for Marshal Garza as a violation of due process. The MSPB was thus plainly alerted to the very problem now before us.

## V

For these reasons, I would set aside the decision of the MSPB as erroneous, but without prejudice to the Marshals Service's hereafter proceeding, if it now can, under proper procedures.