## CORNELIUS, ACTING DIRECTOR, OFFICE OF PERSONNEL MANAGEMENT *v.* NUTT ET AL.

No. 83–1673.   Argued January 7, 1985—Decided June 24, 1985

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 666. POWELL, J., took no part in the decision of the case.

*Charles A. Rothfeld* argued the cause *pro hac vice* for petitioner. With him on the briefs were *Solicitor General Lee, Acting Assistant Attorney General Willard, Deputy Solicitor General Geller, David M. Cohen,* and *George M. Beasley III.*

*Charles A. Hobbie* argued the cause for respondents. With him on the brief was *Mark D. Roth.**

JUSTICE BLACKMUN delivered the opinion of the Court.

Under the Civil Service Reform Act of 1978, Pub. L. 95–454, 92 Stat. 1111, a federal employee may challenge agency disciplinary action by appealing the agency's decision to the Merit Systems Protection Board (Board). If, however, the employee is a member of a collective-bargaining unit of federal employees, he, in the alternative, may challenge the disciplinary action by pursuing any grievance and arbitration procedure provided by the collective-bargaining agreement. Neither the Board nor the arbitrator may sustain the agency's decision if the employee "shows harmful error in the application of the agency's procedures in arriving at such decision." 5 U. S. C. § 7701(c)(2)(A). The Board has interpreted this statute to require the employee to show error that causes substantial prejudice to his individual rights by possibly affecting the agency's decision. This case presents the issue whether a different "harmful-error" interpretation should apply in an arbitration, or, to phrase it another way, whether the arbitrator may overturn agency disciplinary action on the basis of a significant violation of the collective-bargaining agreement that is harmful only to the *union.*

I

The 1978 Act is "a comprehensive revision of the laws governing the rights and obligations of civil servants, [and] contains the first statutory scheme governing labor relations between federal agencies and their employees." *Bureau of Alcohol, Tobacco and Firearms* v. *FLRA,* 464 U. S. 89, 91 (1983). Among the major purposes of the Act were the "preser[vation of] the ability of federal managers to maintain 'an effective and efficient Government,'" *ibid.,* quoting 5 U. S. C. § 7101(b), and the "strengthen[ing of] the position of

---

*\*Lois·G. Williams* filed a brief for the National Treasury Employees Union et al. as *amici curiae* urging affirmance.

federal unions and [making] the collective-bargaining process a more effective instrument of the public interest," 464 U. S., at 107.

To promote the first of these purposes, the Act provides that a federal employee may be removed or otherwise disciplined for unacceptable performance or for misconduct. Specifically, § 4303 establishes procedures by which an agency may remove or demote an employee whose performance is unacceptable. In addition, § 7512 provides that an agency may take adverse action against an employee, including removal, suspension for more than 14 days, reduction in grade or pay, or a furlough of 30 days or less, for, as § 7513 states, "such cause as will promote the efficiency of the service," including misconduct. A federal employee subjected to agency disciplinary action taken pursuant to § 4303 or § 7512 may appeal the agency's decision to the Board. §§ 4303(e), 7513(d), and 7701. The Board must sustain the agency's decision if it is supported by appropriate evidence. § 7701(c)(1).[1] The agency's decision may not be sustained, however, if the employee "shows harmful error in the application of the agency's procedures in arriving at such decision." § 7701(c)(2)(A).[2]

To promote the second of these purposes of the Act—"to strengthen the position of federal unions and to make the

---

[1] Section 7701(c)(1) reads:

"Subject to paragraph (2) of this subsection, the decision of the agency shall be sustained under subsection (b) only if the agency's decision—

"(A) in the case of an action based on unacceptable performance described in section 4303 of this title, is supported by substantial evidence, or

"(B) in any other case, is supported by a preponderance of the evidence."

[2] Section 7701(c)(2) reads:

"Notwithstanding paragraph (1), the agency's decision may not be sustained under subsection (b) of this section if the employee or applicant for employment—

"(A) shows harmful error in the application of the agency's procedures in arriving at such decision;

"(B) shows that the decision was based on any prohibited personnel practice described in section 2302(b) of this title; or

"(C) shows that the decision was not in accordance with law."

collective-bargaining process a more effective instrument of the public interest"—the Act requires federal agencies and unions representing agency employees to "negotiate over terms and conditions of employment, unless a bagaining proposal is inconsistent with existing federal law, rule, or regulation." *Bureau of Alcohol, Tobacco and Firearms* v. *FLRA*, 464 U. S., at 92. Even matters reserved to agency-management discretion, such as discipline, are subject to negotiation concerning the procedures that management officials will observe in exercising their authority. § 7106(b)(2). The Act also requires any collective-bargaining agreement between a federal agency and a union to provide for a grievance procedure and binding arbitration for the resolution of disputes arising under the agreement. §§ 7121(a) and (b). An employee in a bargaining unit having a negotiated grievance procedure that covers agency disciplinary action taken pursuant to § 4303 or § 7512 thus may elect to challenge such action by filing a grievance rather than appealing to the Board. § 7121(e)(1). If the employee elects so to proceed, and the union or the agency invokes binding arbitration, see § 7121(b)(3)(C), the arbitrator is to apply the same substantive standards that the Board would apply if the matter had been appealed. See S. Rep. No. 95–969, p. 111 (1978); H. R. Conf. Rep. No. 95–1717, p. 157 (1978). In particular, the Act provides: "In matters covered under sections 4303 and 7512 . . . which have been raised under the negotiated grievance procedure . . . , an arbitrator shall be governed by section 7701(c)(1) . . . ." § 7121(e)(2). Section 7701(c)(1) incorporates by reference the provisions of subsection (c)(2), including the harmful-error rule. Thus, the statutory scheme mandates that the harmful-error rule is to apply whether the employee challenges the agency action through the Board or through binding arbitration.[3]

---

[3] Although § 7121(e)(2) explicitly refers only to § 7701(c)(1), it is clear from the language of the statute and the legislative history, discussed below, that the harmful-error rule of § 7701(c)(2)(A) is incorporated by

## II

Thomas Rogers and Robert Wilson, Jr. (grievants), were employed by General Services Administration (GSA) as Federal Protective Service (FPS) officers at the Federal Center in Denver, Colo. Rogers patrolled property owned or leased by the Federal Government at various locations in the Denver metropolitan area while maintaining contact either by radio or by telephone with the Command Center. Wilson worked as a dispatcher at the Center. Everything spoken over the radio and telephone lines of the Command Center is recorded on tape. This tape constitutes the record of activity at the Center.

On January 7, 1982, Rogers was on patrol in an official Government car. At the request of his shift supervisor, he drove to his home in a nearby suburb, picked up several cans of beer, and delivered the beer to the supervisor at the Center. The supervisor later drank the beer and left the empty cans at the Center when he went off duty. The following day, the supervisor, while off duty, became concerned that the unexplained presence of empty beer cans might lead to the discovery of his drinking beer while on duty. He therefore telephoned Wilson, at the Command Center, and instructed him to alter the tape for the previous day to include a false explanation for the presence of the beer cans. Wilson complied with this request.

Subsequently, an FPS official monitoring the tapes for an unrelated reason noted irregularities in them and concluded that they had been edited. GSA's Inspector General initiated an investigation. Two special agents went to Rogers' home and asked him to accompany them to the local police station for a "noncustodial" interrogation. The agents made

§ 7121(e)(2). See *Devine* v. *White*, 225 U. S. App. D. C. 179, 199, 697 F. 2d 421, 441 (1983). See also *Devine* v. *Brisco*, 733 F. 2d 867, 872 (CA Fed. 1984). Respondents concede that the harmful-error rule applies to an arbitration as well as to a proceeding before the Board, but they contend that the rule should be interpreted differently in the two contexts.

detailed notes of the interview. Wilson was interviewed in the same manner. Neither was advised that he was entitled to have a union representative present at the interview, and neither requested the presence of a representative.

About a month later, the agents again interviewed the two men separately and asked them to sign affidavits prepared from the agents' notes of the earlier interviews. The grievants made corrections in the proposed affidavits and then, under oath, signed them. In the affidavits, the grievants admitted their participation in the above-described incidents of wrongdoing. As before, the grievants were not advised that they were entitled to have a union representative present, and they did not request representation.

On April 2, 1982, almost three months after the incidents, GSA formally advised the grievants that it proposed to remove them from federal service. Upon receiving written responses to the charges, GSA informed Wilson that he would be removed on grounds of falsification of records and of attempting to conceal activities of record. Similarly, GSA informed Rogers that he would be removed on grounds of falsification of records, failure to report irregularities, and use of a Government vehicle for a nonofficial purpose.[4]

Both grievants elected to challenge their removal under the grievance and arbitration procedures established by the collective-bargaining agreement between GSA and their union, respondent American Federation of Government Employees. The union then invoked binding arbitration pursuant to § 7121(b)(3)(C). The arbitrator, respondent Nutt, found that the grievants had committed the alleged acts of wrongdoing and that this misconduct normally would justify the penalty of removal from Government service. The arbitrator also found, however, that GSA on its part had committed two procedural errors in violation of provisions

---

[4] The supervisor involved in the incident also was discharged. His discharge was upheld by the Board.

of the collective-bargaining agreement. First, GSA had failed to give the grievants an opportunity to have a union representative present during interrogation.[5] Second, GSA had permitted an unreasonable period of time to elapse between the date it first learned of the misconduct and the date it issued the notices of proposed removal.[6] The arbitrator concluded that there was no prejudice to the grievants themselves due either to the failure to have a union representative present or to the delay in the issuance of the notices. He found, nevertheless, that the removals were not for just cause "[s]olely because of the Agency's pervasive failure to comply with the due process requirements of the [collective-bargaining] agreement." App. to Pet. for Cert. 38a. He therefore reduced the penalties imposed on the grievants from removal to not less than two weeks' disciplinary suspension without pay. *Id.*, at 39a. In addition, he required that Wilson be placed in a position in which the agency would be protected from his "demonstrated proclivity to tamper with the tape recording system." *Id.*, at 38a.

---

[5] Article XXVII, § 2, of the collective-bargaining agreement between GSA and the union provides:

"The Employer agrees that during formal discussion where interrogation or written or sworn statements are taken from an employee, in connection with a charge that may result in disciplinary action against him, he will have the opportunity to have a representative present. It should be understood that counseling sessions are not formal discussions." App. to Pet. for Cert. 22a.

The arbitrator interpreted this provision to require that the employee be advised of the right to representation before being investigated.

[6] Article XXVII, § 3, of the collective-bargaining agreement, as supplemented, provides in pertinent part:

"PROPOSED NOTICE: In the event an employee is issued a notice of proposed disciplinary or adverse action, that employee must be afforded and made aware of all his/her rights. These proposed notices shall be served on the employee(s) within a reasonable period of time (normally 40 calendar days) after the occurrence of the alleged offense or when the alleged offense becomes known to management." App. to Pet. for Cert. 23a.

Pursuant to §§ 7703(d) and 7121(f), the Director of the Office of Personnel Management sought review of the arbitrator's decision by the United States Court of Appeals for the Federal Circuit. See 28 U. S. C. § 1295(a)(9). The Director contended that the arbitrator had not properly applied the Act's harmful-error rule. The Court of Appeals granted the petition for review, and it was heard by a 5-judge panel. The court affirmed the arbitrator's decision in substantial part. 718 F. 2d 1048 (1983). It held that an arbitrator must apply the harmful-error standard of § 7701(c)(2)(A) in determining whether a grievant is personally prejudiced. The court noted that, in the present case, the arbitrator found that the grievants had not been personally prejudiced. Nevertheless, following what it deemed to be the lead of the decision in *Devine* v. *White*, 225 U. S. App. D. C. 179, 697 F. 2d 421 (1983),[7] the Court of Appeals went on to hold that even though the particular grievants may not themselves have been adversely affected, the arbitrator, in making the ultimate award, could take into account significant violations of the collective-bargaining agreement that were important to the union. The court reasoned: "The union is a major (if not *the* major) party to the arbitration and its proper interests are to be protected, even though the interests of the particular grievants may not, alone, call for protection" (emphasis in original). 718 F. 2d, at 1054. Here, the union and the agency agreed to procedural safeguards concerning

---

[7] In *Devine* v. *White*, the United States Court of Appeals for the District of Columbia Circuit held that some bargained-for procedural rights are, by definition, substantial rights *of an employee*, and that an agency's violation of those rights constitutes harmful error requiring reversal of the agency's decision even absent a showing that the violation might have affected the outcome of the decision. See 225 U. S. App. D. C., at 201, 697 F. 2d, at 443. The Court of Appeals in *Devine* v. *White* therefore did not interpret the harmful-error rule to protect the rights *of the union*, as did the Court of Appeals for the Federal Circuit in the present case. The decision in *Devine* v. *White*, however, is inconsistent with our decision today insofar as it dispenses with the requirement that harmful error have some likelihood of affecting the outcome of the agency's decision.

representation and notice, and these procedures effectively became union rights. Thus, "[v]iolations of explicit and important procedural rights contained in a contract, such as these, could fairly be said to be tantamount tᴏ 'harmful error' to the union within the scope of 5 U. S. C. § 7701(c)(2)(A) (1982) for the purposes of collective bargaining arbitration in which the union is a proper party." *Id.*, at 1055. The court concluded that the arbitrator's reduction of the grievants' penalties was a proper means of "penalizing the agency" for disregarding the procedural protections of the collective-bargaining agreement.[8] *Ibid.*

Because of the importance of the issue, we granted certiorari. 469 U. S. 814 (1984).

## III

### A

The harmful-error rule of 5 U. S. C. § 7701(c)(2)(A) provides that an agency's decision that is appealable to the Board may not be sustained if the employee "shows harmful error in the application of the agency's procedures in arriving at such decision." Petitioner argues that "harmful error" is error that causes substantial prejudice to the rights of the individual employee by possibly affecting the agency's decision.

The Act does not define the term "harmful error,"[9] and the legislative history of § 7701(c)(2)(A) is inconclusive.[10] The

---

[8] The Court of Appeals, however, did not approve the arbitrator's reduction of Rogers' penalty to two weeks' suspension, since there is a statutorily imposed minimum of one month's suspension for the unauthorized operation of a Government vehicle. See 31 U. S. C. § 1349(b). It therefore ordered the imposition of a one month's suspension for Rogers. 718 F. 2d, at 1055–1056.

[9] It would be natural, however, to assume that Congress intended the term "harmful error" in § 7701(c)(2)(A) to have the same meaning that it has in the judicial context, that is, error that has some likelihood of affecting the result of the proceeding. See, *e. g., United States* v. *Hasting*, 461 U. S. 499, 507–509 (1983); *Kotteakos* v. *United States*, 328 U. S. 750, 760–762 (1946).

[10] The original Senate version of the bill that became the Civil Service Reform Act of 1978 provided that "agency action shall be upheld by the

Act provides, however, that the Board "may prescribe regulations to carry out the purpose of [§ 7701]," the provision in which the harmful-error rule appears. See § 7701(j). Pursuant to this authority, the Board has promulgated a definition of "harmful error":

> "Error by the agency in the application of its procedures which, in the absence or cure of the error, might have caused the agency to reach a conclusion different than the one reached. The burden is upon the appellant to show that based upon the record as a whole the error was harmful, i. e., caused substantial harm or prejudice to his/her rights." 5 CFR § 1201.56(c)(3) (1985).[11]

Board, the administrative law judge, or the appeals officer unless—(A) the agency's procedures contained error that substantially impaired the rights of the employee." See S. Rep. No. 95–969, p. 224 (1978); see also id., at 179. The Senate Report explains: "Henceforth, the Board and the courts should only reverse agency actions under the new procedures where the employee's rights under this title have been substantially prejudiced." Id., at 51. See also id., at 54, 64. The Senate Report does not refer directly to the application of the harmful-error rule in an arbitration. The Report, however, does state that in "the negotiated grievance procedure an arbitrator must apply the same standards in deciding the case as would be applied . . . if the case had been appealed through the appellate procedures of 5 U. S. C. section 7701." Id., at 111. Thus, it is clear that the Senate version of the harmful-error rule focused on the rights of the employee and did not suggest affirmatively that the Board or an arbitrator could take into account the rights of the union.

The Conference Committee did not adopt the Senate version. Petitioner points out that the Joint Explanatory Statement of the Committee on Conference, which explained "the effect of the major actions agreed upon by the managers" of the two bodies, H. R. Conf. Rep. No. 95–1717, p. 127 (1978), did not note that any substantive change in meaning was intended by the change in language. We decline, however, to infer congressional intent to adopt the substance of the Senate version solely on the basis of this legislative silence.

[11] Similarly, in *Parker* v. *Defense Logistics Agency*, 1 M. S. P. B. 489, 493 (1980), the Board explained:

"Unless it is likely that an alleged error affected the result, its occurrence cannot have been prejudicial . . . . Stated another way, the question is

The agency's "procedures" considered by the Board in applying § 7701(c)(2)(A) include not only procedures required by statute, rule, or regulation,[12] but also procedures required by a collective-bargaining agreement between the agency and a union.[13] Thus, in an appeal of an agency disciplinary decision to the Board, the agency's failure to follow bargained-for procedures may result in its action's being overturned, but only if the failure might have affected the result of the agency's decision to take the disciplinary action against the individual employee. At least insofar as it applies to proceedings before the Board, this interpretation of the harmful-error rule is entitled to substantial deference.[14] See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 844 (1984).

Respondents do not dispute the correctness of the Board's definition of harmful error insofar as it applies to proceedings before the Board. Respondents argue, however, that an arbitral proceeding differs significantly from a Board proceeding, and that a different definition of harmful error should apply in the arbitral context. Respondents point out that an appeal to the Board is taken solely by the employee or

---

whether it was within the range of appreciable probability that the error had a harmful effect upon the outcome before the agency."
See also, *e. g., Davies* v. *Department of the Navy*, 4 M. S. P. B. 83, 85 (1980); *Fuiava* v. *Department of Justice*, 3 M. S. P. B. 217, 218 (1980).

[12] See, *e. g., Parker* v. *Defense Logistics Agency*, 1 M. S. P. B., at 492–496.

[13] See, *e. g., Stalkfleet* v. *United States Postal Service*, 6 M. S. P. B. 536, 537 (1981); *Battaglia* v. *Department of Health and Human Services*, 5 M. S. P. B. 212 (1981); *Giesler* v. *Department of Transportation*, 3 M. S. P. B. 367, 368–369 (1980), aff'd, 686 F. 2d 844 (CA10 1982).

[14] The United States Court of Appeals for the Federal Circuit has approved the Board's construction of the harmful-error rule as applied in proceedings before the Board. See, *e. g., Miguel* v. *Department of the Army*, 727 F. 2d 1081, 1084–1086 (1984); *Cheney* v. *Department of Justice*, 720 F. 2d 1280, 1285 (1983); *Shaw* v. *United States Postal Service*, 697 F. 2d 1078, 1080–1081 (1983).

applicant for employment, see 5 U. S. C. § 7701(a), and that the union has no statutory role in a Board proceeding. In contrast, according to respondents, the union should be considered to be a major party in an arbitration. The union and the agency negotiate the grievance procedures and the terms of the collective-bargaining agreement establishing the extent of the arbitrator's authority. The union and the agency possess the exclusive power to invoke the arbitral process, and these parties jointly select an acceptable arbitrator.[15] Thus, according to respondents, while the Board must focus exclusively on the rights of the individual employee, the arbitrator should take a broader view and consider the rights of the union as well. Respondents contend that the Court of Appeals therefore correctly held that "the arbitrator can take account of significant violations of the collective bargaining agreement, important to the union, even though the particular grievants may not have been themselves adversely affected." 718 F. 2d, at 1054.

We are not persuaded by respondents' arguments. Congress clearly intended that an arbitrator would apply the same substantive rules as the Board does in reviewing an agency disciplinary decision. Section 7121(e)(2) provides that in matters involving agency discipline "which have been raised under the negotiated grievance procedure . . . , an arbitrator shall be governed by section 7701(c)(1) of this title, as applicable." Section 7701(c)(1) incorporates by reference the harmful-error rule of § 7701(c)(2)(A). The Senate Report explains that, under this provision, "if an employee exercises the option to pursue a matter [involving agency discipline]

---

[15] On the other hand, it is the employee who makes the initial election whether to use the negotiated grievance procedure at all, see 5 U. S. C. § 7121(e)(1), and who elects whether to seek judicial review of the arbitrator's decision, see §§ 7121(f), 7703(a)(1). Also, by the plain terms of § 7701(c)(2)(A), it is the employee who bears the burden of showing harmful error.

through the negotiated grievance procedure an arbitrator must apply the same standards in deciding the case as would be applied by an administrative law judge or an appeals officer if the case had been appealed through the appellate procedures of 5 U. S. C. section 7701." S. Rep. No. 95–969, p. 111 (1978). The version of the bill passed by the House did not contain a similar provision. The Conference Committee noted that, under the Senate provision, "when considering a grievance involving an adverse action otherwise appealable to the [Board] . . . the arbitrator must follow the same rules governing burden of proof and standard of proof that govern adverse actions before the Board." H. R. Conf. Rep. No. 95–1717, p. 157 (1978). The Conference Committee "adopted the Senate provision in order to promote consistency in the resolution of these issues, and to avoid forum shopping."[16] *Ibid.*

Adoption of respondents' interpretation of the harmful-error rule in the context of an arbitral proceeding would directly contravene this clear congressional intent. An employee who elects to appeal an agency disciplinary decision to the Board must prove that any procedural errors substantially prejudiced his rights by possibly affecting the agency's decision. Under respondents' interpretation, however, an employee who elects to use the grievance and arbitration procedures may obtain reversal merely by showing that significant violations of the collective-bargaining agreement, harmful to the union, occurred. In the present case, if the disciplined employees had elected to appeal to the Board, their discharges would have been sustained by the Board under its interpretation of the harmful-error rule. Because,

---

[16] In addition, Congress made arbitral decisions subject to judicial review "in the same manner and under the same conditions as if the matter had been decided by the Board," 5 U. S. C. § 7121(f), expressly "to assure conformity between the decisions of arbitrators with those of the Merit Systems Protection Board." S. Rep. No. 95–969, p. 111 (1978).

however, they pursued the negotiated grievance and arbitration procedures, they benefited from the different interpretation of the harmful-error rule advocated by respondents and applied by the arbitrator and the Court of Appeals, and their discharges were replaced with brief suspensions. If respondents' interpretation of the harmful-error rule as applied in the arbitral context were to be sustained, an employee with a claim that the agency violated procedures guaranteed by the collective-bargaining agreement would tend to select the forum—the grievance and arbitration procedures—that treats his claim more favorably. The result would be the very inconsistency and forum shopping that Congress sought to avoid.

B

We, however, do not rest our decision solely on deference to the Board's interpretation of the harmful-error rule and on the clear congressional intent that an arbitrator apply the same substantive standards as does the Board. Rather, we rest our decision ultimately on the conclusion that we must interpret the harmful-error rule as does the Board if we are "'to remain faithful to the central congressional purposes underlying the enactment of the CSRA.'" *Lindahl* v. *Office of Personnel Management,* 470 U. S. 768, 794 (1985), quoting *Devine* v. *White,* 225 U. S. App. D. C., at 183, 697 F. 2d, at 425. As noted above, one of the major purposes of the Act was to "preserv[e] the ability of federal managers to maintain 'an effective and efficient Government.'" *Bureau of Alcohol, Tobacco and Firearms* v. *FLRA,* 464 U. S., at 92, quoting 5 U. S. C. § 7101(b). In order to achieve this purpose, one of the "central tasks" of the Act was to "[a]llow civil servants to be able to be hired and fired more easily, but for the right reasons." S. Rep. No. 95–969, p. 4 (1978). In particular, the provisions of § 7701 of the Act, including the harmful-error rule, were intended "to give agencies greater ability to remove or discipline expeditiously employees who engage in misconduct, or whose work performance is un-

acceptable." *Id.*, at 51.[17] In the present case, the grievants concededly committed improper acts that justified their removal from the federal service. Although the agency committed procedural errors, those errors do not cast doubt upon the reliability of the agency's factfinding or decision. We do not believe that Congress intended to force the Government to retain these erring employees solely in order to "penalize the agency" for nonprejudicial procedural mistakes it committed while attempting to carry out the congressional purpose of maintaining an effective and efficient Government.

Respondents argue, however, that penalizing the Government in this manner is necessary in order to enforce the procedures arrived at through collective bargaining, and thus to promote a second major purpose of the Civil Service Reform Act—"to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest." *Bureau of Alcohol, Tobacco and Firearms* v. *FLRA,* 464 U. S., at 107. Respondents contend that if harmful error must be shown in the sense that an employee's own case is prejudiced, then the procedures arrived at through collective bargaining really become meaningless. We find this concern overstated. Under any interpretation of the harmful-error rule, unions are free to bargain for procedures to govern agency action, see §§ 7106 (b)(2) and (3), and agencies are obligated to follow the agreed-upon procedures. If the agency violates those procedures with prejudice to the individual employee's rights, any resulting agency disciplinary decision will be reversed by the Board or by an arbitrator.

Even if the violation is not prejudicial to the individual employee, the union is not without remedy. The Act per-

---

[17] See also S. Rep. No. 95–969, p. 52 (1978) (provisions of § 7701 intended "to eliminate unwarranted reversals of agency actions"); *id.,* at 54 (provisions of § 7701 intended to "avoid unnecessary reversal of agency actions because of technical procedural oversights").

mits the union to file a grievance on its own behalf. § 7121 (b)(3)(A). The Act broadly defines "grievance" to include "any complaint . . . by any employee labor organization . . . concerning . . . the effect or interpretation, or a claim of breach, of a collective bargaining agreement." § 7103(a)(9) (C)(i). This statutory authorization clearly permits the union to file a grievance alleging a violation of the procedural requirements established in the collective-bargaining agreement.[18] The arbitrator can remedy such violation by ordering the agency to "cease and desist" from any further such violation. In addition, if the violation constitutes "a clear and patent breach of the terms of the agreement," *Iowa National Guard and National Guard Bureau,* 8 F. L. R. A. 500, 510 (1982), the union may file an unfair labor practice charge with the Federal Labor Relations Authority.[19] See

---

[18] Respondents argue that requiring the union separately to file a grievance and invoke arbitration in order to enforce its own rights would result in duplicative proceedings. There is, however, no reason why, if the union's institutional grievance and the employee's individual grievance arise from the same factual situation, the two grievances cannot be consolidated by the arbitrator. The only constraint is that, under the harmful-error rule, the arbitrator may not give the employee a windfall by reversing the agency's decision to discipline the employee in order to penalize the agency for violating rights of the union, whenever the violation had no effect on the agency's decision.

[19] In the present case, the union did file an unfair labor practice charge with the Authority. It alleged that "on February 4, 1982, agents of the General Services Administration (GSA) patently breached the applicable collective bargaining agreement by failing to advise unit employees during an interrogation of their right to have a Union representative present." App. to Reply Memorandum for Petitioner 4a. The Acting Regional Director found that it was not clear whether the collective-bargaining agreement required the agency to advise unit employees being interrogated of their right to union representation. She therefore concluded that "the dispute in this case involves differing and arguable interpretations of the contracts' intent and meanings, and should therefore appropriately be resolved through the parties' negotiated grievance/arbitration procedures,

§§ 7116[20] and 7118. Our holding today therefore does not prevent the union from obtaining a binding interpretation of a disputed provision of the collective-bargaining agreement or from enforcing agency compliance with that provision. We hold only that the means of compelling compliance do not include forcing the agency to retain an employee who is reliably determined to be unfit for federal service.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE POWELL took no part in the decision of this case.

---

rather than in the unfair labor practice forum." *Id.*, at 6a. In a case such as this where the meaning of the contract is unclear, the union need only obtain a favorable construction of the contract and an appropriate cease-and-desist order by filing a grievance and invoking arbitration. Any subsequent violation by the agency would then provide a basis for an unfair labor practice charge.

[20] Respondents suggest that § 7116(d) precludes the union from filing an unfair labor practice charge when, as in the present case, an employee initiates a grievance procedure or appeal to the Board based on the same factual situation. Section 7116(d) states:

"Issues which can properly be raised under an appeals procedure may not be raised as unfair labor practices prohibited under this section. Except for matters wherein, under section 7121(e) and (f) of this title, an employee has an option of using the negotiated grievance procedure or an appeals procedure, issues which can be raised under a grievance procedure may, in the discretion of the aggrieved party, be raised under the grievance procedure or as an unfair labor practice under this section, but not under both procedures."

This section provides only that the same aggrieved party cannot raise identical issues under an appeal or grievance procedure and also as an unfair labor practice. It does not preclude a union in its institutional capacity as an aggrieved party from filing an unfair labor practice charge to enforce its own independent rights merely because an employee has initiated an appeal or grievance procedure, based on the same factual situation, to enforce his individual rights. See *Internal Revenue Service, Western Region*, 9 F. L. R. A. 480, 480–481, n. 2 (1982); *United States Air Force*, 4 F. L. R. A. 512, 527 (1980).

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Today the Court holds that the Civil Service Reform Act of 1978 requires that an arbitrator, when reviewing an agency disciplinary action taken in violation of collectively bargained procedures, must ignore the possibility that sustaining the adverse action would be injurious to the legitimate interests of the union and to the integrity of the collective-bargaining process. Following Congress' finding that healthy collective bargaining serves the effective conduct of Government business, I agree with the Court of Appeals that an arbitrator may properly take into account in reviewing an adverse action a procedural error that substantially injures the union's collective-bargaining role. Accordingly, I dissent.

## I

In passing the Civil Service Reform Act of 1978, Pub. L. 95–454, 92 Stat. 1111, Congress declared that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U. S. C. § 7101(a). This finding was based on Congress' study of "experience in both public and private employment," *ibid.*, and on its conclusion that employees' right to "bargain collectively, and participate through labor organizations . . . in decisions which affect them . . . contributes to the effective conduct of public business." *Ibid.* One of the major goals of the Act was to effectuate this policy by establishing the framework for a system of labor organization and collective bargaining in the federal civil service. See 5 U. S. C. § 7101 *et seq.* One of the principal spheres where collective-bargaining rights were guaranteed to federal unions was the negotiation of "procedures *which management officials of the agency will observe*" in taking disciplinary actions against employees. § 7106(b)(2) (emphasis added). Congress also required that collective-bargaining agreements covering federal employees

must provide for grievance procedures that include union-invoked "binding arbitration." § 7121(b)(3)(C).

This case involves the arbitration of agency decisions to remove from Government service two Federal Protective Service officers. Both officers were accused of serious acts of misconduct. The arbitrator determined that they "committed the acts enumerated" and that "under normal circumstances [those acts would] justify their removal from government service." App. to Pet. for Cert. 32a. But the arbitrator also found that the agency's behavior in reaching its decision to remove the grievants was plagued by a "pervasive failure to cómply with the due process requirements of the [collective-bargaining] agreement." *Id.*, at 38a. Among other violations of the contractual procedures, the agency had repeatedly failed to inform either grievant of his right to have a union representative present during all investigatory interviews. The officers' collective-bargaining agreement and a prior arbitration decision unambiguously established both the right to union representation and the right to be informed by the employer of the availability of union representation. Although the arbitrator concluded that it would be "unrealistic to pretend that the Grievants . . . were entirely unaware of their right to representation," *id.*, at 34a–35a, he also concluded that some modification of the agency action was necessary to avoid denigration of the collectively bargained procedural requirements.

In the Court's view, this decision violated the Act's requirement that an employee complaining of procedural errors associated with an adverse action decision must "sho[w] harmful error in the application of the agency's procedures in arriving at such decision." § 7701(c)(2)(A). The Court rejects the position of the Court of Appeals for the Federal Circuit, under which an arbitrator's finding of a significant injury *to the union* stemming from the agency's "[v]iolations of explicit and important procedural rights contained in a contract," 718 F. 2d 1048, 1055 (1983), constitutes "harmful

error." Instead, the Court holds that the harmful-error standard prohibits consideration of any violation that did not affect "the result of the agency's decision to take the disciplinary action against the individual employee." *Ante*, at 659. But neither the wording of the standard offered by the Court today, nor the statutory language and history, require that arbitrators ignore the possibility that sustaining an agency action may—because of an agency's refusal to honor contractual obligations in reaching its disciplinary decisions—result in substantial injury to the continued stability of union-agency collective-bargaining relations. By requiring the arbitrator to ignore this factor, the Court undermines the clear congressional intent to gain for the federal sector the benefits derived from a system of stable collective bargaining.

## II

The Court analyzes the concept of "harmful error" in an adverse action case as it would in the context of a criminal trial.[1] Similarly, it narrowly defines the issue before the arbitrator as whether the grievants had in fact committed the acts of misconduct of which they were accused. But by statutory mandate the issue before an arbitrator in an adverse action case is not simply whether the grievants have committed the alleged acts of misconduct; it is rather whether the grievants' removal from the service was for "such cause as will promote the efficiency of the service." § 7513(a). This flexible statutory standard easily encompasses Congress' desire to assure that stable collective-bargaining relationships be established in agencies,[2] and accordingly, the con-

---

[1] See *ante*, at 657, n. 9 ("assum[ing] that Congress intended the term 'harmful error' . . . to have the same meaning that it has in the judicial context" and citing two criminal cases, *United States* v. *Hasting*, 461 U. S. 499, 507–509 (1983) and *Kotteakos* v. *United States*, 328 U. S. 750, 760–762 (1946), for the proper standard). But see n. 2, *infra*.

[2] Cf. *Kotteakos* v. *United States, supra*, at 760–762 (in evaluating what is harmful error, "[w]hat may be technical for one is substantial for another; what minor and unimportant in one setting crucial in another").

cern for stable collective-bargaining relationships is relevant to the statutory concept of harmful error.[3]

The statutory phrase "such cause as will promote the efficiency of the service" predates the Civil Service Reform Act's recognition of federal sector collective bargaining. See *Arnett* v. *Kennedy*, 416 U. S. 134, 158–164 (1974) (plurality opinion) (discussing history of phrase). Nonetheless it has always been understood as an "admittedly general standard," *id.*, at 159, adaptable to the situations faced by "myriad different federal employees performing widely disparate tasks." *Ibid.* It was certainly meant to leave room for Congress' evolving conceptions of what constitutes efficient public management. A plurality of this Court has previously explained that "longstanding principles of employer-employee relationships, like those developed in the private sector, should be followed in interpreting the [standard]," *id.*, at 160, and this point takes on special importance in light of Congress' decision that success of collective bargaining in the private sector should to some extent serve as an example for the federal workplace. But whether one looks to the concept of "just cause" that has developed in the unionized private sector or confines the inquiry to the findings made by Congress upon

---

[3] The court below was not alone in recognizing the relevance to the "harmful error" standard of Congress' concern for healthy and stable collective bargaining. This recognition was also at the heart of the Court of Appeals for the District of Columbia Circuit opinion in *Devine* v. *White*, 225 U. S. App. D. C. 179, 697 F. 2d 421 (1983). Writing for that court, Judge Edwards concluded that "a violation of a clear provision of a collective bargaining agreement could constitute 'harmful error' under the theory that some bargained-for procedural rights are, by definition, substantial rights of an employee." *Id.*, at 201, 697 F. 2d, at 443. Judge Edwards argued that employees' participation in the collective-bargaining process to obtain certain rights reflects that those employees have "attached considerable importance" to those rights. To allow agency decisions to stand, even if they are made in clear violation of these "substantial rights of an employee," "would . . . be inconsistent with Congress' desire to ensure that the federal government, as well as the private sector, receiv[e] the benefits that flow from collective bargaining." *Ibid.*

passage of the Civil Service Reform Act, the arbitrator's consideration of collective-bargaining concerns in his evaluation of "cause" was proper.[4]

## III

The Court's discussion of harmful error leaves unanalyzed the public interest in collective bargaining and thus fails to consider whether that interest should be taken into account in the analysis of what constitutes "such cause as will promote the efficiency of the service." § 7513(a). Instead it principally rests on the fact that "one of the 'central tasks' of the Act was to '[a]llow civil servants to be able to be hired and fired more easily.'" *Ante*, at 662 (quoting S. Rep. No. 95–969, p. 4 (1978)).

The Court reasons that because the grievants in this case had "concededly committed improper acts that justified their removal from the federal service," *ibid.*, it would defeat a major purpose of the Act to force their reinstatement because of procedural errors that "do not cast doubt upon the reliability of the agency's factfinding or decision."

---

[4] Arbitrator Nutt rested his decision to modify the adverse actions on the accepted practice of arbitrators interpreting the "just cause" standard. See App. to Pet. for Cert. 36a. ("This approach has been taken by most arbitrators and will most likely assure the Agency's making certain that the contract is followed in the future"). It is clear that his approach does conform to generally accepted arbitration practice. See, *e. g.*, *General Telephone Co.*, 78 Lab. Arb. 793 (1982); *City of Sterling Heights*, 80 Lab. Arb. 825 (1983) (local government public sector arbitration); *Fort Wayne Community Schools*, 78 Lab. Arb. 928 (1982) (same). See generally F. Elkouri & E. Elkouri, How Arbitration Works 633, and n. 110 (3d ed. 1973) (collecting citations to published opinions of labor arbitrators).

Although arbitrators have sustained disciplinary actions in spite of management's failure to follow bargained-for procedures, these cases usually rested not only on the absence of prejudice to the grievant, but also on the principle that "compliance with the spirit of . . . procedural requirements [may be] held to suffice." *Id.*, at 634. The instant case, however, involves an agency that made little effort to comply with either the letter or the spirit of the agreement.

*Ibid.* But the agency's decision that removal of these employees would serve the "efficiency of the service" included no consideration of the possible injuries to collective bargaining caused by the serious procedural errors committed by the agency. Given Congress' determination that stable collective-bargaining relationships would serve "the effective conduct of public business," § 7101(a), it cannot be so quickly said that the errors involved in this case "do not cast doubt upon the reliability of the agency's . . . decision." If one takes Congress' determination seriously, then the agency's decision is indeed called into question.[5]

It is true that facilitating collective bargaining was not the only goal of the Act, and that Congress also intended to "preserv[e] the ability of federal managers to maintain 'an effective and efficient Government,'" *Bureau of Alcohol, Tobacco and Firearms* v. *FLRA,* 464 U. S. 89, 92 (1983) (quoting 5 U. S. C. § 7101(b)), and to "'[a]llow civil servants to be able to be hired and fired more easily.'" *Ante,* at 662 (quoting S. Rep. No. 95–969, p. 4 (1978)). These concerns certainly influenced many aspects of Congress' detailed statutory scheme for the governance of the civil service. Indeed, Congress explicitly reserved as "management rights"

---

[5] Given the fact that an agency's decision is supposed to reflect a determination that an adverse action serves the "efficiency of the service," I do not believe that the definition of "harmful error" actually offered by the Court or at various times by the Merit Systems Protections Board, see *ante,* at 659, necessarily demands that an arbitrator ignore injuries to the collective-bargaining process. The issue is whether those injuries can be taken into account in determining "cause."

Moreover, it is not surprising that the MSPB's definition does not explicitly mention concerns regarding collective bargaining, because unlike arbitration cases, MSPB cases are brought by individual employees rather than by unions. The MSPB's definition reflects a failure to have considered issues of collective bargaining more than it reflects a considered determination of the issues presented here. It is thus not surprising that the Court chooses not to rest its decision primarily on grounds other than deference to the MSPB. *Ante,* at 662–665.

the authority "to suspend, remove, reduce in grade or pay, or take other disciplinary action against . . . employees." § 7106(a)(2)(A). But Congress also explicitly provided for collective bargaining to establish procedures that "the agency will observe in exercising [its] authority" in this area, § 7106(b)(2), and the legislative history of this provision makes clear that Congress well understood that bargained-for procedures could severely limit management's freedom of action over discipline.[6]

While the Court underemphasizes the importance of collective bargaining, it overemphasizes the harm to the service of allowing the arbitrator's decision to stand. The issue is not whether common and trivial procedural errors will be a reason for putting clearly unfit people back in positions where they will do harm; this case involves neither a common nor a trivial procedural error, and the arbitrator established no requirement that an employee be returned to a position where he will do harm.

The arbitrator found the violations of the agreement "pervasive," App. to Pet. for Cert. 38a, and it was only on that basis that the Court of Appeals affirmed. The concept of

---

[6] The legislative language and history makes clear that Congress took quite seriously the rights of unions to negotiate procedures binding on agencies regarding those agencies' exercise of management authority. One of the floor managers of the bill, explaining this provision as it emerged from the Conference Committee, stressed that under "the clear language of the bill itself, any exercise of the enumerated management rights [such as the right to discipline employees] is conditioned upon the full negotiation of arrangements regarding adverse effects and procedures." 124 Cong. Rec. 38715 (1978) (comments of Rep. Ford). He stressed that contract proposals were fully valid even if they had "[a]n indirect or secondary impact on a management right," ibid., and that "procedures and arrangements are to be negotiated with regard to both the decisionmaking and implementation phases of any exercise of management authority." Ibid. The Conference Report went so far as to acknowledge that the right to negotiate on procedures regarding the exercise of management rights gives the parties the ability to "indirectly do what the [management rights] section prohibits them from doing directly." H. R. Conf. Rep. No. 95–1717, p. 158 (1978).

harmful error was not written out of the statute in this case, for the Court of Appeals concluded that "violations of explicit and important procedural rights contained in a contract, such as these, could fairly be said to be tantamount to 'harmful error' to the union." 718 F. 2d, at 1055. Under this standard, an arbitrator would certainly be prohibited from reversing an agency's adverse actions because of technical contract violations not serious enough to injure the collective-bargaining process. See *Devine* v. *Brisco,* 733 F. 2d 867 (CA Fed. 1984) (reversing an arbitrator's refusal to sustain an agency determination because of procedural errors that were not shown seriously to compromise the union's position).

Moreover, Government agencies will, it is hoped, not frequently commit flagrant violations of their collective-bargaining agreements. Thus, the burden of decisions like that of arbitrator Nutt will not be great. To the extent that a Government agency perceives a need for greater flexibility, it can seek that freedom through the congressionally sanctioned means—the collective-bargaining process. See *Devine* v. *White,* 225 U. S. App. D. C. 179, 201, 697 F. 2d 421, 443 (1983) ("Within the areas in which bargaining is permissible, we believe, as did Congress, that government managers are competent to look out for the government's interests").

Lastly, the arbitrator here did not simply ignore the agency's interest by ordering the return of an unqualified grievant to his old position. Instead, because the arbitrator agreed that one of the grieving employees could not be trusted to perform adequately at his old position, he gave the agency substantial flexibility in determining the capacity to which the employee would be reinstated. App. to Pet. for Cert. 38a–39a (allowing agency to reinstate grievant Wilson to any nonclerical position in which "he can reasonably be expected to perform satisfactorily" even if that position would be at the entrance level).

The Court is wrong to fear that it will undermine Government's efficiency to follow the unionized private sector and

incorporate concerns for the stability of collective bargaining into the evaluation of agency disciplinary actions. Giving force to Congress' view that healthy collective-bargaining relationships serve the effective conduct of public business does not displace the importance of maintaining the "efficiency of the service." To the extent that an arbitrator's decision ignores efficiency concerns, I do not doubt that it would be invalid. In formulating the "harmful error" standard, Congress understood that there would be instances where adverse actions would not serve the public interest even if in the abstract the misconduct rendered the employees deserving of the disciplinary action.[7]

## IV

By determining that collective bargaining in the federal work force was in the public interest, Congress may have made the concept of "cause as will promote the efficiency of the service" slightly more complex. But it understood that this complexity has long been a part of the successful operation of collective bargaining.

Accordingly, I dissent.

---

[7] See n. 6, *supra,* and accompanying text.