314 F.3d 1367
 Kimberly ADAMS, Dale Anderson, Jr., Kenneth Baalman, Patricia C. Ball, Debbie Barkman, Celeste B. Berry, Debra Billings, Linda Bland, Monica A. Boyd, Anita Brewster, Trenace R. Brown, George Burkel, Annette Brown-Burnett, Victoria R. Carthen, Jimmy Chan, Kathy Collier, Paul D. Collier, Racheal Collins, Joyce Dunlap, Elizabeth L. Eaglin, Maggie L. Ester, Juanita Esters, Kathleen Flynn, Carolyn Ford, Richard L. Frierdich, Jr., Michael Gaffney, Lauren Glass, Doris Gilmore, Kathleen Glauber, Patricia Gramm, William Grawe, Josephine C. Gray, Lyonette Gordon, Karen L. Griffith, Doris Grinston, Carol Hadley, Karriem Hale, Kay Lepp Hefflinger, Denise M. Hemmer, Consuela S. Henderson, Latanya Henderson, Shurketia Herring, Theresa Holland, Kimberly E. Holton, David Hotard, Peggy Hubbard, Theresa M. Huxhold, Judith Jackson-Buckner, Felicia Johnson, Jeffery P. Johnson, Kimberly Johnson, John J. Jones, Tracy Jones, Tequella Jones-Dee, Pamela Joseph, Bernard S. Kim, Lisa Kitners, Katherine P. Krause, Richardine Lawrence, Sandra Lenoir, Hannah Lewis, Shueyan Lim, Emma G. Lingelbach, Lashonda Lofton, Steven Love, Linda J. Mack, Matthew Maney, Debra A. Martin, Diana J. Martin, Lashonda Martin, April Mays, Sheila Meeks, Ruby Mitchell, Karen P. Moore, Lavonda Morehouse, Sonya G. Muhammad, Sonja M. McDonald, J.L. McMahan, Norma McMullen, Charlotte McRoberts, Stacie Nash, Gail Nunn, Jacqueline Pegues, Robert Penning, Carolyn Pennington, Deborah Pickens, Merindia Poe, Donna M. Pollihan, Thomas J. Porter, Sheila Pratcher, Karen Pugh, Christopher Quinn, Jane Rea, Deidre A. Richardson, Elaine Riley, Linda M. Robertson, Aida M. Rocafort, Thomas J. Rodgers, II, Marilyn Rolf, Mark A. Russell, Cordelia J. Sadowski, Mary Sanders, Adrienne J. Scott, Karen E. Sedor, James J. Smith, Stuart A. Smith, Taisha Smith, Marilyn Starks, Patricia Steyer, Pamela A. Sturm, Samuel P.B. Steward, III, Jennifer Taylor, Robert M. Taylor, Sherri A. Taylor, Alitha Thomas, Beverly A. Thomas, Tanya Thompson, Osiris Tucker, Asha Turner, Zelma Walker, Keith Ward, Joddie M. Ware, Lynda Washington, Adrienne Wenecki, Janet Werths, Clarence Westbrook, Michelle West, Valerie West, Heidi Wetzel, Katherine Wick, Elicia Wilson, and F.F. Zielinski, Petitioners,
v.
INTERNAL REVENUE SERVICE, Respondent.
 No. 01-3385.
 United States Court of Appeals, Federal Circuit.
 January 8, 2003.
 
 Barbara A. Atkin, Deputy General Counsel, National Treasury Employees Union, of Washington, DC, argued for petitioners. With her on the brief were Gregory O'Duden, General Counsel; and Caryl L. Casden, Assistant Counsel.
 Opher Shweiki, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; and Robert E. Kirschman, Jr., Assistant Director. Of counsel on the brief was William P. Lehman, Chief Counsel, Office of Chief Counsel, Internal Revenue Service, of Chicago, IL.
 Before LOURIE, BRYSON, and DYK, Circuit Judges.
 BRYSON, Circuit Judge.
 
 
 1
 A group of seasonal employees at the St. Louis, Missouri, offices of the Internal Revenue Service ("IRS") challenge the agency's decision to place them in nonduty, nonpay status for two weeks each year. An arbitrator upheld the agency's practice based on his conclusion that the Office of Personnel Management ("OPM") regulations governing seasonal employment compelled the agency to release the employees in that manner. The employees seek review of the arbitrator's decision. We affirm the arbitrator's decision in the agency's favor.
 
 
 2
 * The 132 petitioners are employed at the IRS's customer service call site in St. Louis. From 1984 through 1996, the St. Louis call site employed a number of seasonal employees to answer taxpayer inquiries and adjust taxpayer accounts. During that period, the seasonal employees worked year-round. In 1996, however, IRS regional management directed the local management at the St. Louis call site to place all seasonal employees in nonduty, nonpay status for one two-week pay period each year. The IRS regional management explained that its decision resulted from what it regarded as a need to comply with the pertinent OPM regulations, which define seasonal employment as "annually recurring periods of employment of less than 12 months each year." 5 C.F.R. § 340.401(a). In response, the local chapter of the National Treasury Employees Union ("NTEU"), the union that represents IRS employees at the St. Louis call site, cooperated with local IRS management to develop a scheduling mechanism that would provide the seasonal employees with some flexibility in selecting their release periods. Under that procedure, each of the seasonal employees was placed in nonduty, nonpay status for one two-week pay period in 1996, 1997, and 1998.
 
 
 3
 In May 1999, local IRS management at the call site informed the seasonal employees that they would again be placed in nonduty, nonpay status for one two-week pay period before the end of the current fiscal year. Accordingly, each of the affected employees was asked to indicate a preference for the pay period for which he or she wished to be released between July 1 and September 30, 1999. This time, however, the local NTEU chapter notified management that it objected to what it characterized as the involuntary furlough of the seasonal employees. The union asserted that the placement of seasonal employees in nonduty, nonpay status violated the seasonal employment provisions of the applicable collective bargaining agreement between the IRS and the NTEU. In particular, the union relied on the provision in the agreement stating that the "sole determinants of the length of time an employee is in pay status are the availability of work and the employee's standing on the release and recall list."
 
 
 4
 The NTEU subsequently asked the IRS for an explanation of the release of the seasonal employees. Local IRS management responded that OPM's regulations, in particular 5 C.F.R. § 340.401(a), require seasonal employees to be employed for a period of less than 12 months a year. The IRS explained that it could satisfy that regulation by releasing each seasonal employee for one two-week pay period. The NTEU then filed a grievance on behalf of the seasonal employees. When management and the union were unable to settle the dispute, the issue was presented to an arbitrator for decision.
 
 
 5
 Following a hearing, the arbitrator ruled in favor of the agency. The arbitrator found, based on the agency's stipulation, that the release of each of the seasonal employees for a two-week period was not ordered because of the unavailability of work. For that reason, the arbitrator concluded that the release of the seasonal employees constituted a furlough that violated the terms of the collective bargaining agreement. The arbitrator further determined, however, that the regulatory definition of seasonal employment mandated that the IRS engage in the "bureaucratic artifice" of an annual furlough. Because the arbitrator concluded that the OPM regulations required that the seasonal employees be released for some period each year, and that the OPM regulations trumped the provisions of the collective bargaining agreement, the arbitrator denied the NTEU's grievance.
 
 
 6
 The petitioners sought review of the arbitrator's decision pursuant to 5 U.S.C. § 7121(f), which allows this court to review arbitration awards that raise claims involving adverse agency actions under 5 U.S.C. § 7512 in the same manner as if the matter had been decided by the Merit Systems Protection Board. See generally Cornelius v. Nutt, 472 U.S. 648, 105 S.Ct. 2882, 86 L.Ed.2d 515 (1985). Because the arbitrator's decision addressed the question whether the petitioners were subjected to an adverse action within the meaning of section 7512, i.e., a furlough of 30 days or less, this court has jurisdiction under section 7121(f) to review the arbitrator's disposition of that issue.
 
 II
 
 7
 Federal agencies have hired employees on a seasonal basis for at least the past 40 years. Although there is no express statutory authorization for seasonal employment, OPM has invoked the general authority of the President to prescribe regulations for the admission of individuals into the federal civil service and to govern the competitive service, 5 U.S.C. §§ 3301, 3302, and has promulgated regulations authorizing agencies to hire seasonal employees. See Nat'l Treasury Employees Union v. Merit Sys. Prot. Bd., 743 F.2d 895, 902-03 n. 6 (D.C.Cir.1984); 49 Fed.Reg. 17,722 (Apr. 25, 1984); 60 Fed.Reg. 3061 (Jan. 13, 1995).
 
 
 8
 OPM's seasonal employment regulations define seasonal employment as "annually recurring periods of work of less than 12 months each year" and state that "[s]easonal employees are permanent employees who are placed in nonduty/nonpay status and recalled to duty in accordance with preestablished conditions of employment." 5 C.F.R. § 340.401(a). The OPM regulations, however, do not specify the duration of a season. Instead, they provide that "[a]gencies determine the length of the season, subject to the condition that it be clearly tied to [the] nature of the work." Id. § 340.402(b).
 
 
 9
 The OPM regulations require agencies to execute individual employment agreements with each seasonal employee prior to the employee's entry onto duty, informing the employee that he or she is subject to periodic release and recall as a condition of employment. 5 C.F.R. § 340.402(c). When a seasonal employee is released in accordance with the conditions set forth in the employee's individual employment agreement, the release does not constitute an adverse action furlough as that term is used in 5 U.S.C. § 7512, which lists the adverse agency actions that are appealable to the Merit Systems Protection Board. See Strickland v. Merit Sys. Prot. Bd., 748 F.2d 681, 684 (Fed.Cir.1984) ("Placing a seasonal employee in a nonduty, nonpay status in accordance with conditions established at the time of employment is not an adverse action `furlough' under 5 U.S.C. § 7511(a)(5) and does not give rise to the adverse action procedures of 5 U.S.C. § 7513."); see also Nat'l Treasury Employees Union, 743 F.2d at 898-99 (upholding OPM regulations that temporarily placed seasonal employees in nonduty, nonpay status without affording them the protections required in connection with adverse agency actions). However, if the seasonal employee is released at a time or in a manner inconsistent with the employee's individual employment agreement, the release constitutes a "furlough" within the meaning of 5 U.S.C. § 7512 and may be challenged if the agency fails to comply with the substantive and procedural requirements of 5 U.S.C. § 7513. Whether or not the release constitutes an adverse action furlough thus turns on "the employee's reasonable expectations when he agreed to work subject to the conditions of employment." Strickland, 748 F.2d at 684.
 
 III
 
 10
 In this case, the employees' reasonable expectations are defined in their individual employment agreements and the collective bargaining agreement. The individual employment agreements, of which there are two representative examples in the record, advise the employees that the agency's greatest need for their services is between December and April (for responding to taxpayer inquiries), between March and September (for account-related inquiries), and throughout the year (for those employees assigned to "the ACS Branch"). The agreements further advise the employees that they "may expect to be in work status four (4) to twelve (12) months."
 
 
 11
 The portion of the individual employment agreements entitled "Conditions of Employment" provides in pertinent part:
 
 
 12
 This is to certify that I understand and accept the following conditions of employment for the position identified above.
 
 
 13
 1. I will work during annually recurring periods of employment, described under season(s) above, which total less than twelve (12) months per calendar year. I may be periodically placed in nonduty/nonpay status for short periods during my season(s), usually for such reason as a lack of work.
 
 
 14
 2. I will be subject to periodic release to nonduty/nonpay status and recall to duty/pay status at various times throughout the year as determined by the availability of work and my standing on the release and recall list.... While the periods of time I can reasonably expect to work are outlined under season(s) above, the sole determinant of the length of time I am actually in a duty/pay status are the availability of work and my standing on the applicable release/recall list.
 
 
 15
 The first sentence of the "conditions of employment" portion of the individual employment agreement specifies that the employees' seasons will "total less than twelve (12) months per calendar year." The collective bargaining agreement contains a similar provision stating that seasonal employment "is annually recurring periods of employment totaling less than twelve (12) months a calendar year." In light of that clear language, the petitioners should have expected to be employed for less than 12 months annually. Indeed, given the definition of seasonal employment in the OPM regulations ("annually recurring periods of work of less than 12 months each year"), the very fact that the petitioners are denominated "seasonal employees" indicates that they should expect to work less than 12 full months each year.
 
 
 16
 In the sentence following the "less than 12 months" provision, the individual employment agreements state that within each employee's season, the employee may be placed in nonduty, nonpay status for reasons such as lack of work. That provision is followed by a largely redundant provision stating that the employee understands that he or she will be subject to periodic release to nonduty, nonpay status as determined by the availability of work.
 
 
 17
 In context, the two clauses of the individual agreements that refer to the conditions under which the employee is subject to periodic release to nonduty, nonpay status must be understood to refer to periods of release that occur during the course of the employee's season. As noted, the employee's season is clearly defined as a period of less than 12 months, with the particular period to be selected by the agency. The allusion to periodic release for lack of work cannot refer to the release that occurs at the end of the employee's season. If it did, it would mean that each employee's season would be assumed to be a full year long and would be subject to shortening only if the agency could establish that it lacked work for a particular individual at a particular time. That interpretation of the "periodic release" provision would be entirely inconsistent with both the OPM regulations and the clauses in the collective bargaining agreement and the individual employment agreements that provide that a season is a period of less than 12 months. In fact, that interpretation, if adopted, would have the effect of giving the seasonal employees essentially the same status as full-time permanent employees.
 
 
 18
 In light of the contract language, the IRS's decision to place all the seasonal employees on nonduty, nonpay status for two weeks each year is best viewed as an invocation of the agency's authority to define each employee's season. Characterizing the 50-week work period as each employee's season is consistent with the representation in the employment agreements that the employees could expect to be in work status between four and 12 months each year, but less than 12 full months.
 
 
 19
 Our reasoning differs somewhat from the arbitrator's. The arbitrator concluded that the release of the seasonal employees for a two-week period each year violated the collective bargaining agreement and the individual employment agreements, but that the OPM regulations compelled the agency to disregard the requirements of those contracts. As explained above, we do not agree that the language of the collective bargaining agreement or the individual employment agreements creates an entitlement by which employees are given the right to work year-round except in the event of unavailability of work. Instead, we construe the "availability of work" clauses in the collective bargaining agreement and in the individual employment agreements to describe the circumstances under which the seasonal employees may be released at some point during their season. As so construed, the "availability of work" clauses do not conflict with the underlying premise, which is contained in the regulations, the collective bargaining agreement, and the individual employment agreements, that the agency must fix a season of less than 12 months.
 
 
 20
 We do not mean to suggest that the IRS or any other agency has unlimited discretion under the OPM regulations to place employees on nonduty, nonpay status simply by characterizing any release period as outside the employees' seasons. In this case, however, the characterization of the employees' release as incident to the definition of their seasons is supported by a number of factors: (1) the parties gave the agency broad discretion to define the employees' seasons in the collective bargaining agreement and the individual employment agreements; (2) the agency announced the timing and duration that the employees would be released in 1999 well in advance of the time of their release; (3) the two-week period of release for each employee in 1999 was consistent with the two-week period of release that the agency had adopted in each of the three previous years; and (4) as noted, a release of some duration during the 1999 calendar year was necessary to satisfy the requirement that each employee's season be less than 12 months long. These factors persuade us that the two-week release period at issue in this case is properly viewed as part of the definition of the petitioners' seasons, not as a release during the course of their seasons that could constitute a furlough.
 
 
 21
 The petitioners contend that the IRS had lawful alternatives to placing them on nonduty, nonpay status for two weeks, including assigning them "to other work during the projected layoff period," 5 C.F.R. § 340.402(b), or converting them to the status of full-time employees, see id. § 340.402(a) ("Seasonal employment may not be used as a substitute for full-time employment or as a buffer for the full-time workforce."). While it is true that the OPM regulations permit agencies to select other options that could avoid the need to release the employees, such as converting them to full-time permanent status, the regulations do not require the agencies to do so. Furthermore, the petitioners' argument ignores the fact that the parties' contractual arrangements — including the collective bargaining agreement, the terms of which were negotiated by the NTEU — state that the employees would be employed for periods of less than 12 months. In addition, the collective bargaining agreement and the individual employment agreements give the IRS broad discretion to define each employee's season and do not require the agency to consider, much less implement, substitute measures, such as converting the employees to full-time permanent service. The IRS was therefore within its rights to define the employees' season as 50 weeks of work per year and to release them to nonduty, nonpay status during the remaining two-week period.
 
 IV
 
 22
 Because the two-week release of the petitioners from their employment duties was consistent with their employment agreements, the two-week release was not an adverse action furlough within the meaning of 5 U.S.C. § 7512. See Strickland, 748 F.2d at 684; Nat'l Treasury Employees Union, 743 F.2d at 898-99. The arbitrator therefore properly concluded that the petitioners were not entitled to the substantive and procedural protections set forth in 5 U.S.C. § 7513 for persons subjected to adverse agency actions.
 
 
 23
 
 AFFIRMED.