Kenneth D. SMITH, Petitioner,

v.

UNITED STATES POSTAL
SERVICE, Respondent.

Appeal No. 85–2168.

United States Court of Appeals,
Federal Circuit.

April 24, 1986.

Stephen M. Zeitlin, Headley & Zeitlin, Brooklyn, N.Y., for petitioner.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, M. Susan Burnett, Asst. Director and Karen S. Fishman, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., for respondent; Stephen E. Alpern, Associate Gen. Counsel and Eric J. Scharf, U.S. Postal Service, of counsel.

Before MARKEY, Chief Judge, and FRIEDMAN and NEWMAN, Circuit Judges.

MARKEY, Chief Judge.

Kenneth D. Smith (Smith) appeals from a decision of the Merit Systems Protection Board (board), 26 M.S.P.R. 185, sustaining his removal from United States Postal Service (Postal Service) for assaulting a police officer. We affirm.

### Background
#### (1) The Removal

In March 1982, the Postal Service sought to remove Smith for "engaging in a physical altercation with another postal employee." Smith filed a grievance and was represented at a Step 1 hearing by a union Shop Steward, J. Applewhite, who made oral reply on Smith's behalf. Smith was reinstated, but "on a last chance basis."

At 3:17 a.m. of March 10, 1984, Smith was seen carrying a fur coat from the J.A. Farley Building at which he worked. Smith became involved in an incident with Postal Police Officer Vincent Condon and Postal Police Sergeant Michael Padro. He was restrained and then transported to Morgan Headquarters, where he refused to surrender his photo identification. At that time, Officer Condon placed Smith under arrest and he was taken to Central Booking, where he was charged with the crime of resisting arrest.[1]

On March 20, 1984, the Postal Service sent Smith four copies of a Notice of Proposed Removal (Notice): by certified and regular mail to 2140 University Ave., Apt. 2B, Bronx, New York 10468; and by certified and regular mail to 1504 Sheridan Ave., Bronx, New York 10457.

On that same day, the Postal Service mailed a copy of the Notice to Smith's union representative, who arranged for a grievance proceeding Step 1 hearing on April 3, 1984.

The Notice set forth charges of assaulting a Postal Police officer, engaging in disorderly conduct, and resisting arrest, and cited the 1982 disciplinary proceeding.

The notice provided that:

You may answer this notice personally or in writing, or both to the undersigned [i.e., Daniels] or the Postmaster's Designee in my absence at the *JAF Building, Outgoing Mails Section, Tour 3, New York,* New York 10199, and may submit affidavits in support of your answer.... You will be allowed seven (7) calendar days from the date you receive this notice to submit your answer. Full consideration will be given to any answer you submit. As soon as possible after your answer(s) is received, or after the expiration of the seven (7) day limit, if you do not answer, you will be given a written decision."

The Notice also provided that "you have the right to file a grievance under the Grievance-Arbitration procedures set forth in Article 15, Section 2 of the National Agreement within 14 days of your receipt of this notice."

---

1. On March 27, 1984, the Postal Service, having sent Smith a Notice of Removal, moved the court for Adjournment in Contemplation of Dismissal of the criminal charges, which charges were eventually dismissed. There is no merit in Smith's argument that dismissal of the criminal charges weakens the agency's case for his removal.

When Smith did not appear at the April 3 Step 1 hearing, oral reply was made on his behalf by Shop Steward J. Applewhite. Smith says he did not receive the Postal Service's Notice until April 5, 1984.[2] He also says that on April 18 he attempted to contact Supervisor Daniels to obtain a Step 1 hearing, but was "denied access to the building."

The Postal Service's Letter of Decision was dated April 5, 1984. In it, the deciding official, Tour Superintendent Robert Pellot, stated that he had given "full consideration to the oral reply" made on Smith's behalf by Shop Steward Applewhite, and that removal was appropriate in view of Smith's past disciplinary record and the seriousness of the charge. The removal was to become effective April 23, 1984.

### (2) The Hearing Before the Presiding Official

Officer Condon testified that: Smith approached him carrying a brown bag containing a fur coat, but could not produce a receipt or property pass; Smith at first refused to return to the facility to obtain a property pass, but later went inside; Officer Condon's supervisor, Padro, arrived at the scene; Smith returned with his package and ran through the doors; Officers Condon and Padro chased and apprehended Smith, who swung at Officer Condon and pushed him up against the wall; Smith was arrested for resisting arrest. Condon's testimony was corroborated by that of Officer Padro.

Smith testified that: he received the fur coat from a co-worker to show it to his wife; Officer Condon stopped him at the facility exit and demanded that he show his property pass; he returned inside to obtain a pass, but was unsuccessful; he returned to the exit and heard the guard yell "incom-ing" and the elevator door slam; both noises reminded him of his Vietnam experiences, and his automatic response was to take cover; he ran outside and got between a van and car; Officer Condon came up and accused him of stealing the coat; he never assaulted either officer.

Arthur Head, an agency employee, testified for Smith that: he saw Smith talking with the two officers; he saw no violence; when asked if there was a problem, Smith said everything was "all right". Smith also introduced an affidavit of Vaughn, an agency employee, who stated that "from what he was able to see" Smith did not swing at the officers.

Tour Superintendent Pellot testified that he considered an assault on a Postal Police Officer to be a serious charge warranting removal. Supervisor Willie Daniels said that, in proposing removal, he based his decision on the officers' written reports, and that his concern was not for the ownership of the fur coat, but, noting Smith's past disciplinary record, for the safety of the facility.

### (3) The Presiding Official's Opinion

The Presiding Official credited the testimony of Officers Condon and Padro, saying their statements "were candid, complete and plausible." The Presiding Official noted that neither Head nor Vaughn testified that he had seen the entire incident, and that the statements of neither contradicted those of the two officers. The Presiding Official found Smith's version of the incident "totally implausible".

The Presiding Official held that the Postal Service had carried its burden with respect to the charge of assaulting a Postal Police Officer. She further concluded that nexus to the efficiency of the service was

---

**2.** The Postal Service mailed the four Notices of Proposed Removal to Smith and a copy to his union representative on March 20, 1984. It is well-established "that a letter which is properly sealed, stamped, addressed, and deposited in the United States mails is presumed to reach the addressee and be received by him in due course of the mails." *See, e.g., Charlson Realty Co. v. United States,* 384 F.2d 434 (Ct.Cl.1967). The union representative obviously received his copy sometime before scheduling the April 3 hearing. Smith asserts that sixteen days transpired between the mailing of the Notices and his receipt of at least one of them. Even today, that is far more than the "due course of the mails." Inexplicably, however, the agency accepted without challenge Smith's statement that he did not receive a Notice until April 5, and we must, therefore, do the same.

clear, and that the agency had not abused its discretion in determining the appropriate penalty.

In respect of Smith's affirmative defenses, the Presiding Official determined that Smith had not shown error in the agency's holding a grievance with only the union representative present. Assuming, *arguendo*, however, that such were error, she further held that Smith had not established that it was harmful, reasoning that "[t]he Board's hearing is *de novo*, thus any prejudice to the appellant could have been cured before the Board."

### (4) *The Decision of the Full Board*

The Full Board denied review. It commented, based on Smith's allegation of late notice, that the Postal Service erred in failing to afford Smith the full thirty days' notice, as required by 5 U.S.C. § 7513(b)(1). On the basis of the record before it, however, the board concluded that any error in this case did not warrant reversal because Smith had not shown "by a preponderance of the evidence that the procedure likely had a harmful effect upon the outcome before the agency."

### OPINION

Though Smith says an issue in this case is whether substantial evidence supports the board's conclusions, he presents no argument and cites no evidence to support a reversal on that ground.[3]

Smith's asserted basis for this appeal is that the agency action "should be reversed because the petitioner was denied due process," effectively asserting *per se* harmful error "in that Petitioner was not given the opportunity to defend himself in the Step One hearing." The government responds that "any error that may have occurred was clearly cured at the MSPB hearing where Smith presented his reply to the charges at a *de novo* proceeding." We reject both contentions respecting harmful error as too broadly stated.

### (1) *Constitutional Due Process*

■ No basis exists for Smith's assertions respecting constitutional due process. Smith has not shown that he was denied the necessary minimum due process, "some pretermination opportunity to respond," to which he is entitled under the Constitution. *See Cleveland Board of Education v. Loudermill,* —— U.S. ——, ——, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985); *see also DeSarno v. Department of Commerce,* 761 F.2d 657 (Fed.Cir.1985). The record here establishes that Smith had "opportunity". His union representative presented an oral reply on Smith's behalf. That same procedure was used in connection with Smith's 1982 grievance and with positive results. We have been shown no basis for assuming that the union was representing itself and not Smith in this case. That Smith's union representative was not successful in gaining for Smith a second "last chance" does not in itself mean that that representation supplied him less than due process. Because Smith's oral reply was fully considered by the deciding official, it must be deemed to have satisfied the due process minimum.

Were we convinced that Smith had been denied his right to constitutional due process by agency action, negligence, or design, and in the face of even a reasonable effort by Smith to assert that right, reversal would promptly follow. None of those factors is present here.

Nothing in this record indicates even remotely that the agency sought to deny Smith any of his rights, or neglected its duty, or in any manner played "fast and loose" with the procedures designed to insure protection of employee's rights.

Assuming that Smith did not receive the Notice of Proposed Removal until April 5,

---

**3.** The dissenting opinion presents a far more extensive review of the record and a more persuasive set of arguments than those presented by counsel for Smith. The dissenting opinion accepts as facts untested assertions appearing on forms in the record, some of which are significantly different from the facts testified to before the presiding official. For the reason set forth in the text, however, we find unpersuasive the view that a fundamental deprivation of due process or harmful error occurred in this case.

nothing of record indicates that he attempted to present, and there is clearly no evidence that he was prevented from presenting, oral or written reply to Daniels during the period April 5–23.

Thus Smith failed to avail himself of his statutory right to answer orally and in writing at the agency level, 5 U.S.C. § 7513(b)(2), by failing to request a hearing within seven days of receiving his notice of removal.

Nor does anything in this record suggest that Smith made any true effort whatever to obtain a Step 1 hearing at which he might be present. To the contrary, the record establishes that *all* he did, or said he did, was go to the JAF building, be "denied access", and leave.[4] On the present record, Smith made no phone calls, sent no letters or telegrams, and made no complaint to his union.

Though the Notice told him of his right to request a Step 1 hearing within fourteen days after April 5, there is not a word of testimony or scintilla of evidence in the record before us showing that, at any time between April 5 and April 23, Smith telephoned or wrote to Daniels' office, or contacted his union representative, or took any other reasonable steps to request a Step 1 hearing or to otherwise exercise or protect his grievance rights. Moreover, nothing here suggests that Smith petitioned for reconsideration of the Decision Letter, or did anything else at any time that might have put the agency on notice that he was either seeking a hearing or alleging any procedural error.

The agency's first notice of Smith's due process allegations occurred at the time of the hearing before the presiding official. Absence of notice to the agency would be of no moment if an actual denial of constitutional due process were present. Agencies can be presumed to know the rules. Yet, in the context of the present case, where Smith remained silent until he got to the board, the absence of opportunity to rectify the error is illuminating. The agen-

cy, for example, could not have known that Smith, as he first said before the board, did not receive its Notice until sixteen days after it was mailed. If agencies could not rely on the due course of the mails, they could never safely act, for the employee could always wait till he is removed and then, before the board, claim late receipt of the Notice. During the pre-termination period, the agency could have justifiably presumed that Smith had received the Notice by March 23d or 25th, had elected not to attend the April 3 hearing, and had decided to present his oral reply through his union representative.

In all events, agencies are not psychic. The agency and Smith knew that he had been given a "last chance" in 1982, and his failure to appear personally at the April 3 hearing may have been thought to arise from a feeling of futility on his part. Absent some notice by Smith, the Postal Service could not have had, and could not have obtained, knowledge of any failure of the mails or other defect in pre-termination procedure and could have had no reason to rectify the situation by a *sua sponte* scheduling of a new Step 1 hearing.

■ The statute, 5 U.S.C. § 7513(b)(1), calls for receipt of written notice thirty days before an adverse action may be taken. Smith was removed thirty-four days after the agency had mailed its Notice to him. If Smith's testimony that he first received any Notice on April 5 be accepted as true, as it must be on this record, we would necessarily conclude that Smith was inadvertently accorded eighteen days notice from that date of receipt of notice, i.e., twelve days less than the period prescribed. The board recognized that as agency error, though the record does not indicate how the agency could have known that Smith had not received any of its four letters to him until April 5. If error there were, as indicated below, it was not in this case harmful and does not compel reversal return to duty, and payment of back pay to

---

4. Smith did not testify as to whether his union representative had told him of the Notice, or why he was denied access, or what time of day or night he went to the building, or who denied him access, or whether others were denied access at the same time.

Smith. The agency cannot be penalized and the public fisc cannot be charged as a result of an event (late Notice receipt) so inconsequential in this case that Smith did nothing for eighteen days, except go once to the JAF building.

As the Supreme Court noted in *Loudermill*, "[t]here are, of course, some situations in which a post-deprivation hearing will satisfy due process requirements." —— U.S. at —— n. 7, 105 S.Ct. at 1493 n. 7. Were it necessary to decide, the present would be one such situation. Here, it is uncontroverted that at least eighteen days before the removal took effect, Smith had written notice of the charges against him, an adequate explanation of the agency's evidence, notice of the intent to remove him on April 23, and *opportunity* to request a Step 1 hearing. As above indicated, it cannot be controlling that the oral reply made by his representative was not successful at the April 3 hearing.[5] Having made no reasonable effort to approach the agency for eighteen days after receipt of notice, Smith nonetheless had the opportunity to do so during that period, and thereafter made a full presentation of his case *de novo* before the board. *See Doyle v. Veterans Administration*, 667 F.2d 70, 72 (Ct.Cl.1981). Under all the facts of this case, we cannot conclude that Smith was deprived of constitutional due process.

### (2) *Harmful Error*

Though treated separately here, denial of due process and harmful error are in this case intertwined. Both rest on Smith's late receipt of notice.

For purposes of the harmful error rule, 5 U.S.C. § 7701(c)(2)(A) (1982), "[a]n employee who elects to appeal an agency disciplinary decision to the Board must prove that any procedural errors substantially prejudiced his rights by possibly affecting the agency's decision." *Cornelius v. Nutt*, —— U.S. ——, ——, 105 S.Ct. 2882, 2890, 86 L.Ed.2d 515 (1985); *see also Mercer v. Department of Health and Human Services*, 772 F.2d 856 (Fed.Cir.1985).

The board defined "harmful error" in 5 CFR § 1201.56(c)(3) as "[e]rror by the agency in the application of its procedures which, in the absence or cure of the error, might have caused the agency to reach a conclusion different than the one reached." In *Parker v. Defense Logistics Agency*, 1 MSPB 489, 1 M.S.P.R. 505 (1980), the board further refined the inquiry, saying "the question is whether it was within the range of appreciable probability that the error had a harmful effect upon the outcome before the agency." *Id.* at 493, 1 M.S.P.R. at 514. Though further judicial refinements may be possible, the board's interpretation of the harmful error rule is entitled to substantial deference, and has been approved by the Supreme Court. *See Nutt*, —— U.S. at —— & n. 14, 105 S.Ct. at 2889 & n. 14.

■ It is Congress' clear intent that agencies have a "greater ability to remove or discipline expeditiously employees who engage in misconduct," S.Rep. No. 95–969, p. 51, 1978 U.S.Code Cong. & Ad.News 2723, 2773, and that unnecessary reversals of agency actions because of technical procedural oversights be avoided. *Nutt*, —— U.S. at —— & n. 17, 105 S.Ct. at 2891 & n. 17. Thus, though an agency commits a procedural error, reversal by the board is unwarranted unless that error casts sufficient doubt on the reliability of the agency's factfinding or decision. *See id.* at 2891. On review of the board's decision on the harmful error question, as on all others, our review is limited by the standard set forth in 5 U.S.C. § 7703(c).

As above indicated, we do not accept Smith's effective assertion of *per se* harmful error. In enacting 5 U.S.C. § 7701, Congress did not intend that agencies be "punished" for nonprejudicial errors they may have committed while attempting to carry out Congress' mandate "to maintain 'an effective and efficient Government.'" *Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Authority*, 464

---

**5.** We find nothing in the record to suggest that, if the mails had taken four days instead of 16, Smith or his representative would have told a story at the April 3 hearing different from that found so incredible by the presiding official.

U.S. 89, 92, 104 S.Ct. 439, 441, 78 L.Ed.2d 195 (1983); *see Nutt*, —— U.S. at ——, 105 S.Ct. at 2891. "It is insufficient simply to show that a statutory procedure was not followed at the agency level. Harmful error must be shown." *Handy v. United States Postal Service*, 754 F.2d 335 (Fed. Cir.1985) (denial of statutory right to oral reply).

▪ Nor, as above indicated, can we accept the Government's assertion that proceedings before the board, solely because they are *"de novo"*, must always be seen as having worked a *per se* cure of any procedural error that may have occurred at the agency level. Were that the case, judicial review of harmful error determinations would be a fruitless enterprise. As this court has stated, a person may have a "better and perhaps dispositive chance" of successfully contesting an adverse action at the agency level. *Mercer*, 772 F.2d at 860. Though that practical observation does not lessen the employee's burden of showing harmful error, 5 C.F.R. § 1201.-56(c)(3), it appropriately focuses the attention of the board and the reviewing court on events and possibilities at the agency level.

The statements of Head and Vaughn, which Smith now says he would have been presented at the Step 1 hearing, were presented to the Presiding Official, who accorded them minimal weight. No one has challenged in the briefs filed in this court the first hand, unambiguous, and entirely credible testimony of Officers Condon and Padro (which was subject to cross-examination before the Presiding Official), nor has counsel for Smith challenged the Presiding Official's determination that Smith's testimony was inherently non-credible. Smith has shown us no reason why, had *all* the evidence presented at the board hearing also been presented at the Step 1 hearing, identical minimal weight would not have been accorded the statements of Smith's witnesses, or why identical credibility determinations would not have been drawn respecting the testimony of Condon, Padro, and Smith.

Smith, who as indicated bears the burden of establishing harmfulness, has not suggested anything that he might have said or done or presented at the predetermination hearing that might have caused a different agency decision. To say, as does Smith, only that the same evidence presented to the board might have been viewed differently by the agency would be to make every error harmful and to require reversal of every board determination that an error was harmless.

Smith proposes that we order him restored to his position in the Postal Service, and award him back pay and promotions, etc., so that the agency may then give him a predetermination hearing before again removing him. That is not required in this case.

The record before us confirms the board's conclusion that any error present here was harmless. *Devine v. Brisco*, 733 F.2d 867, 872–73 (Fed.Cir.1984) ("a mere conjectural possibility of prejudice cannot suffice as a basis for inferring actual prejudice"); *see also Devine v. White*, 697 F.2d 421, 442 (D.C.Cir.1983).

We are unable on this record to conclude that if the testimony and affidavit presented to the presiding official had been presented to the agency at the pretermination stage a different outcome might have been reached, 5 CFR § 1201.56(c)(3), or even that such testimony and affidavit could possibly have affected a change in the agency's decision. —— U.S. at ——, 105 S.Ct. at 2890. The error was therefore harmless.

### (3) *Conclusion*

Having determined that Smith has not established a denial of due process or harmful error in the agency's conduct, we affirm on the basis of the board's opinion because we do not find that the board's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or that it was obtained without procedures required by law, rule, or regulation having been fairly followed, or that it was unsupported by substantial evidence. 5 U.S.C. § 7703(c) (1982); *see*

*Hayes v. Dept. of the Navy,* 727 F.2d 1535, 1537 (Fed.Cir.1984).

AFFIRMED.

NEWMAN, Circuit Judge, dissenting.

I respectfully dissent. The agency removed Mr. Smith without following certain fundamental requirements set by statute, thus denying Mr. Smith the minimum due process to which the agency was bound. In addition, the procedures utilized by the agency to effect his removal constituted harmful procedural error. The agency violated statute, the Constitution, and binding precedent. It can not be excused.

Mr. Smith was sent, by regular and certified mail, a notice dated March 20, 1984 proposing to remove him "no earlier than 30 days from the date you receive this notice". The notice stated:

> You may answer this notice personally or in writing, or both ... and [you] may submit affidavits in support of your answer.... You will be allowed seven (7) calendar days from the date you receive this notice to submit your answer. Full consideration will be given to any answer you submit. As soon as possible after your answer(s) is received, or after the expiration of the seven (7) day limit, if you do not answer, you will be given a written decision.
>
> You have the right to file a grievance under the Grievance—Arbitration procedures set forth in Article 15, Section 2 of the National Agreement within 14 days of your receipt of this notice.

The certified mail notice was received by Mr. Smith on April 5, 1984.[1] On April 3, 1984 the agency held a Step 1 grievance hearing at the union's request. Smith was not present and, as discussed *infra,* did not know that the hearing was taking place.

On April 5, 1984, the same day that Mr. Smith received the certified mail notice, the agency issued its final decision removing

him from the federal service effective April 23, 1984. Thus Mr. Smith was denied the statutory opportunity to reply, "personally or in writing", prior to his removal. His subsequent attempts to reply and to schedule a Step 1 hearing were rebuffed.

The majority holds that Smith's rights were nevertheless fully protected because a union representative was present at the Step 1 union hearing, interpreting this as a sufficient reply "on Smith's behalf", an interpretation for which there is no support in the record. Smith was denied his minimum pretermination right of response, a recognized right of fundamental due process, not subject to exculpation as "harmless" error.

## I.

Pursuant to 5 U.S.C. § 7513(b), the law requires that:

> An employee against whom an action is proposed is entitled to—
>
> (1) at least 30 days' advance written notice ... stating the specific reasons for the proposed action;
>
> (2) a reasonable time, but not less than 7 days, to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer;
>
> (3) be represented by an attorney or other representative; and
>
> (4) a written decision and the specific reasons therefor at the earliest practicable date.

As part of the balance of rights and obligations established in the Civil Service Reform Act of 1978, this statute provides "minimum rights of an employee against whom an adverse action is proposed". S.Rep. No. 969, 95th Cong., 2d Sess. 50 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 2723, 2772. By section 7513(b)

---

1. The presiding official stated that Mr. Smith testified that he received the certified mail notice on April 4, 1984. This appears to be an error, as the hearing transcript shows that Mr. Smith testified to the April 5th date. The record contains the certified mail receipt bearing the April 5th date, and the government brief also uses this date. Both dates are after the date of the Step 1 grievance hearing. (Although the majority appears to place weight on the mailing of four copies of the Notice of Proposed Removal, two copies were sent to the wrong address.)

Congress "increase[d] the procedural protections afforded employees" through

several additional procedural protections, such as the right of an employee to submit additional kinds of documentary evidence to the agency, and to reply orally as well as in writing to the charges.

*Id.* at 46, 1978 U.S.Code Cong. & Ad.News at 2768. The Senate Report noted that "[t]he procedural protections afforded employees at the agency level are increased or codified in statute for the first time." *Id.*

Guidance in the relationship between these statutory rights and basic considerations of due process is found in *Cleveland Board of Education v. Loudermill*, —— U.S. ——, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985), wherein the Supreme Court described the minimum pre-termination right of response:

[T]he pretermination "hearing," though necessary, need not be elaborate....

.    .    .    .    .

The essential requirements of due process ... are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.

The Court held that " 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action", citing *Mathews v. Eldridge*, 424 U.S. 319, 343, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976), but the gravamen of the holding is that such opportunity to reply can not be eliminated entirely. *Id.* The court observed:

Even where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect.

*Id.* at 1494. *See also Mercer v. Department of Health and Human Services*, 772 F.2d 856, 860 (Fed.Cir.1985); *Miguel v. Department of the Army*, 727 F.2d 1081, 1085–86 (Fed.Cir.1984).

It is thus clear that a minimum pre-termination right of response, set by statute or rule or agreement, can not be omitted with-

out violating the basic tenets of due process of law. The majority nevertheless holds that the total abrogation of the statutory right of response set in 5 U.S.C. § 7513(b) can constitute "harmless error".

In all prior instances where less than the full § 7513 procedures were provided by the agency and the "harmless error" rule was invoked to uphold the agency action, actual notice of the charges had been received by the employee and some opportunity to respond was available to the employee prior to termination. *See, e.g., Handy v. United States Postal Service*, 754 F.2d 335 (Fed.Cir.1985) (agency failure to provide oral right of reply harmless error where written right of reply available to employee); *Adams v. Department of Transportation, FAA*, 735 F.2d 488 (Fed. Cir.), *cert. denied sub nom. Schapansky v. Department of Transportation*, —— U.S. ——, 105 S.Ct. 432, 83 L.Ed.2d 358 (1984) (six day rather than statutory seven day reply period not harmful error); *Schapansky v. Department of Transportation, FAA*, 735 F.2d 477 (Fed.Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 432, 83 L.Ed.2d 358 (1984) (less than thirty day statutory notice period not harmful error when there was reasonable cause to believe a crime had been committed).

The Board has routinely found harmful procedural error when an agency action was taken without any of the procedures of 5 U.S.C. § 7513(b). In *Hall v. United States Postal Service*, 26 M.S.P.R. 233, 237 (1985), for example, the Board observed that "an agency's failure to provide any of the procedural protections of 5 U.S.C. § 7513 in effecting an adverse action constitutes harmful error because an employee's ability to defend is impaired and the outcome before the agency is affected", citing *Baracco v. Department of Transportation*, 15 M.S.P.R. 112, 123 n. 9 (1983), *aff'd sub nom. Adams v. Department of Transportation, FAA*, 735 F.2d 488 (Fed. Cir.), *cert. denied sub nom. Schapansky v. Department of Transportation*, —— U.S. ——, 105 S.Ct. 432, 83 L.Ed.2d 358 (1984). *See also Benjamin v. U.S. Postal Service*, 26 M.S.P.R. 670, 671 n. 1 (1985); *Van Skiv-*

*er v. United States Postal Service*, 25 M.S.P.R. 66, 67 n. 2 (1984); *Shibuya v. Department of the Interior*, 18 M.S.P.R. 607, 609 (1984); *Padilla v. Equal Employment Opportunity Commission*, 18 M.S.P.R. 121, 126–27 (1983); *Niles v. Department of Justice*, 8 MSPB 421, 9 M.S.P.R. 63, 67–68 (1981); *Cuellar v. United States Postal Service*, 8 MSPB 282, 8 M.S.P.R. 624, 632 (1981); *Kerr v. National Endowment for the Arts*, 5 MSPB 299, 5 M.S.P.R. 260, 262 (1981); *White v. Department of the Treasury*, 4 MSPB 11, 3 M.S.P.R. 488, 491 (1980).

In *Hodnick v. Federal Mediation and Conciliation Service*, 8 MSPB 182, 8 M.S.P.R. 508, 510 (1981), the Board summed up the importance of the § 7513(b) right as follows:

> Section 7513(b) of 5 U.S.C. provides that an employee against whom an action is proposed is entitled to at least 30 days advance written notice of the charges. This requirement is designed to afford the employee an opportunity to defend against the proposed charges. The entitlement of employees to advance specific notice of the charges and the opportunity to answer them before a final agency decision is made are fundamental procedural rights. *See Baughman v. Green*, 229 F.2d 33 (D.C.Cir.1956); *Deak v. Pace*, 185 F.2d 997, 999 (D.C.Cir.1950). The right to make an informed reply at the agency level is granted in order to attempt to resolve the dispute before irreversible positions are taken and further proceedings become necessary. *Albert v. Chafee*, 571 F.2d 1063, 1067 (9th Cir.1977).

In *Parker v. Defense Logistics Agency*, cited by the majority for the Board's enunciation of the harmful error rule, the Board also noted that "caution must be exercised in applying the harmful error doctrine when basic rights to procedural due process are implicated." 1 MSPB 489, 1 M.S.P.R. 505, 514 n. 6 (1980), citing *Doe v. Hampton*, 566 F.2d 265, 277–78 n. 29 (D.C.Cir.1977).

The Board decision that the majority affirms is plainly at odds with Board precedent, and irreconcilable with the Supreme Court's holding in *Loudermill* that the basic guarantees of notice and an opportunity to respond, provided in that case by state law, are of constitutional dimension. The absolute denial of these rights to Smith, rights here provided by federal law, can not be harmless procedural error, because his removal was effected without minimal due process. Thus the agency's decision to remove Mr. Smith was "not in accordance with law". 5 U.S.C. §§ 7701(c)(2)(C); 7703(c)(1).

## II.

The majority holds *sua sponte* that the grievance hearing initiated by the union satisfies the legal requirements.

Mr. Smith's claim to a pre-termination hearing is grounded in his union's agreement with the agency. Pursuant to 5 U.S.C. § 7513(c), "[a]n agency may provide, by regulation, for a hearing which may be in lieu of or in addition to the opportunity to answer provided under subsection (b)(2) of this section." *See also* 5 C.F.R. § 752.-404(g). However, the statutory right of reply granted by 5 U.S.C. § 7513(b)(2) should not be confused with the regulatory right to a hearing possible via 5 U.S.C. § 7513(c). Mr. Smith was entitled to both types of pretermination process, and the agency denied him either one.

The Board has held that collective bargaining agreements represent guiding principles and establish nondiscretionary policy "which have the effect of regulatory requirements in addition to those of 5 C.F.R. Part 752", and that the Board will enforce employee rights derived from such negotiated agreements "in the same manner as are provisions of the agency's regulations". *Giesler v. Department of Transportation*, 3 MSPB 367, 3 M.S.P.R. 277, 280 (1980). The Supreme Court has reaffirmed that "unions are free to bargain for procedures to govern agency action" and that "agencies are obligated to follow the agreed-upon procedures." *Cornelius v. Nutt*, —— U.S. ——, 105 S.Ct. 2882, 2891, 86 L.Ed.2d 515 (1985). "If the agency violates those procedures with prejudice to the individual employee's rights, any resulting agency disci-

plinary decision will be reversed by the Board...." (*Id.*)

It is not disputed that Mr. Smith was entitled by union agreement to a hearing at the agency level; the agency's notice of proposed removal recognized that this hearing right was in addition to the seven day oral and written right of reply. No excuse was offered for the agency's failure to provide Mr. Smith his right under the union agreement. As the Supreme Court said in *Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974):

> Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required. *Service v. Dulles*, 354 U.S. 363, 388 [77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403] (1957); *Vitarelli v. Seaton*, 359 U.S. 535, 539–540 [79 S.Ct. 968, 972–973, 3 L.Ed.2d 1012] (1959).

We need not decide whether, following *Loudermill*, Smith was entitled on due process grounds to both the 7–day statutory right of reply and the hearing right set in the union contract, although *Morton v. Ruiz* supports that conclusion. Nor need we decide whether it could have been harmless error to omit one of these procedures if the other were met, or whether a grievance hearing might in some situations cure constitutionally defective termination procedures, because in the case at bar the grievance hearing initiated by the union did not provide the bare minimum of constitutional due process insofar as it affected Mr. Smith.

It is not disputed that Mr. Smith did not know that a Step 1 grievance hearing had been held at the union's request, in his absence. He had no notice of the hearing, and no opportunity to respond or even be present. The majority seeks to remedy these fundamental omissions by imputing a sort of constructive notice to Mr. Smith through the union's shop steward Mr. Applewhite, and by retroactively designating Mr. Applewhite's statement at the Step 1

hearing as Mr. Smith's "oral reply". Mr. Applewhite was not designated by Mr. Smith to represent him. It is a truism that a person can not be duly heard when the person has no knowledge of the hearing, and can not be represented without authorization or knowledge of the representation.

By agreement, the union had the independent right to file a grievance. This right is separate from the employee's right to grieve, as is stated in the union agreement. Article 15 of the National Agreement between the United States Postal Service and the American Postal Workers Union, AFL–CIO provides in relevant part:

*Section 2. Grievance Procedures-Steps*

Step 1: (a) Any employee who feels aggrieved must discuss the grievance with the employee's immediate supervisor within fourteen (14) days of the date on which the employee or the Union first learned or may reasonably have been expected to learn of its cause. The employee, if he or she so desires, may be accompanied and represented by the employee's steward or a Union representative. The Union also may institute a grievance at Step 1 within 14 days of the date the Union first became aware of (or reasonably should have become aware of) the facts giving rise to the grievance. In such case the participation of an individual grievant is not required.

Thus the union instituted a grievance, "the participation of [Mr. Smith] was not required", and it did not occur.

It is uncontroverted that Mr. Smith did not initiate the grievance, and that when he subsequently sought to do so he was denied entry to the building. After he learned that Mr. Applewhite appeared on his behalf at the Step 1 hearing Mr. Smith could have ratified this appearance as constituting his oral reply, *see Anderson v. Department of Transportation, FAA*, 735 F.2d 537, 540 (Fed.Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 432, 83 L.Ed.2d 358 (1984), but he did not do so.[2] Whatever

---

**2.** The record, devoid of any designation of Mr. Applewhite as Mr. Smith's representative before the agency, contains a statement in Mr. Smith's appeal form designating Mr. Joel Schneck as

Mr. Applewhite's reason for initiating the union grievance, he was not Mr. Smith's legal representative. His actions cannot bind Mr. Smith, nor cure the agency's due process violations.

The interest of the union in a given case may or may not be coextensive with that of the employee. *See, e.g., Devine v. Nutt,* 718 F.2d 1048, 1054 (Fed.Cir.1983), *rev'd on other grounds, Cornelius v. Nutt,* —— U.S. ——, 105 S.Ct. 2882, 86 L.Ed.2d 515 (1985). As noted by the Supreme Court in *Nutt,* the Civil Service Reform Act permits the union to file a grievance on its own behalf to allege "a violation of the procedural requirements established in the collective-bargaining agreement". 105 S.Ct. at 2891 (footnote omitted). *See also* 5 U.S.C. §§ 7103(a)(9)(C)(i), 7121(b)(3)(A).

Evidence that Mr. Applewhite was primarily protecting the interests of the union rather than that of Mr. Smith can be found in the record of the Step 1 hearing. The agency's form summarizing the hearing states that the union's position was only "that termination of employee should be changed to a suspension". The union made no attempt to *disprove* the charges of "assault on a security police, disorderly conduct, resisting arrest and theft of a fur coat"; matters of primary importance to Mr. Smith, as seen in his subsequent defense before the Board. There is no evidence that the union attempted to contact Mr. Smith and his witnesses to testify with regard to the events in question. The union did not, on the record of the hearing, object to the stated charge "theft of a fur coat", although petitioner was never in fact charged with theft of the coat. A union policy of advocating mitigation of penalties, however, is one which the union could pursue independent of a specific employee's offense or guilt, for the general benefit of its membership, and this practice would not require the presence of the particular employee.[3]

Mr. Smith duly objected to this procedure. In his notice of appeal to the Board Mr. Smith described the agency action sought to be appealed as, *inter alia,* "appointing a representative for me without my consent or knowledge" and "the holding of a hearing about this case without my consent or knowledge". Similarly, in explaining why the agency action was wrongful, petitioner stated that "I did not authorize any one to represent me" and "[a] hearing was held before I was notified of the charges". In response to the question "Have you, or anyone on your behalf, filed a formal grievance or complaint, including an unfair labor practice charge, with your agency or any other agency concerning this matter?", Mr. Smith stated that he had not done so, and referred to. his earlier statement that he had "requested Forman [sic] Daniels to allow me a hearing on 4–18–84 and he refused". These statements were repeated before the presiding official, before the Board, and to this court on appeal.

At the hearing before the presiding official, the agency made no attempt to establish that shop steward Applewhite was Mr. Smith's designated representative, but instead maintained that the union had a right to a Step 1 hearing on its own behalf. There was no evidence or argument, whatsoever, controverting Mr. Smith's position that he did not have notice of the hearing or of the charges against him, or that he did not have an opportunity to respond, personally or by a designated representative, prior to the agency's decision to terminate his employment. This can not satisfy the barest minimal requirements of due process of law.

### III.

The majority concludes that any procedural error, if made, was harmless. 5 U.S.C. § 7701(c)(2)(A); 5 C.F.R. § 1201.-56(c)(3).

---

Mr. Smith's union representative before the Board.

**3.** The role of the union with regard to Mr. Smith's 1982 offense was the same: mitigation of a penalty of removal to a suspension. Con-

trary to the speculation in the majority opinion, the record does not establish whether Mr. Smith or the union filed the earlier grievance, or whether Shop Steward Applewhite appeared on behalf of the union or the petitioner at that time.

The harmful error rule was discussed in *Mercer*, wherein this court applied the holding in *Nutt* that an employee must prove that "any procedural errors substantially prejudiced his rights by possibly affecting the agency's decision". 105 S.Ct. at 2890. *Nutt* affirmed that an agency's failure to follow its own procedures will result in the agency action being overturned "only if the failure might have affected the result of the agency's decision to take disciplinary action against the individual employee". *Id.* at 2889. In a context similar to that of Mr. Smith, the *Mercer* court viewed the question as follows:

> While the burden is on [petitioner] to show that the failure to grant him the predecision hearing was harmful to his defense so that a different result *might have* been reached, the burden is not on him to prove that the outcome of such a hearing *would have* changed the result, an impossibility. He only needed to show that it was an error which *could have* changed the result.

772 F.2d at 859.

Mr. Smith's removal was the direct result of the agency holding the pre-termination hearing in his absence, both by denying him the right to appear in his own defense and by allowing uncontroverted evidence to be used against him. The Board's presiding official held that any error was harmless because Mr. Smith received a full trial on the merits before the presiding official.

The presiding official stated that she believed the police officers as against Mr. Smith and his witnesses. Were credibility the question before us now, I would not disturb the credibility findings of the Board on appeal. *Griessenauer v. Department of Energy*, 754 F.2d 361, 364 (Fed.Cir.1985). But the question is not whether the presiding official correctly determined credibility; rather, the question is whether the procedures followed by the agency removed the possibility of a less unfavorable outcome at the *agency* level.

A review of the entire record shows that much of the information before the agency was erroneous on its face and highly prejudicial. For example, the instigating cause for the entire confrontation was Mr. Smith's possession of the fur coat, but no charge of theft was ever made. Officer Condon testified that "[t]he primary reason why Mr. Smith was arrested was because of the coat." The agency record contained Postal Inspector Scott's April 26, 1984 investigation memo of an interview with Mr. Smith's co-worker Ms. Marion Holland on April 12, 1984. The memorandum states that Ms. Holland brought the mink coat to work in a brown paper sack to sell to Mr. Smith for his wife. After the incident Ms. Holland gave Mr. Smith the receipt for the mink coat so that he could reclaim it from the police property clerk; Mr. Smith had "told her that he needed it because 'they' thought he stole the coat that he had."

Further, the presiding official found that there was no evidence on the charge of resisting arrest, suggesting that some credibility determinations could be drawn in Smith's favor, and that this charge would have fallen at the agency level.

The petitioner had no opportunity to raise any such mitigating factors at the union-initiated grievance hearing, at which the charges of theft of the coat and resisting arrest were presented without contradiction.

Before the Board, Mr. Smith contradicted the statements of the arresting officers Condon and Padro, and officers Condon and Padro contradicted each other. Mr. Smith testified that when he ran out of his building he was chased by the two postal officers and placed under arrest, but that he did not assault either of the officers:

> The officer didn't understand why I went out the door. I was explaining to him and the officer insisted on placing me under arrest. I raised my right hand and turned over to the wall. I was placed under arrest at that time.[4]

---

**4.** The quotations from the transcript are as provided in the agency's brief, although minor errors were observed.

The agency did not have Mr. Smith's in-person denial, nor an oral or written reply to the charges, when at the Step 1 hearing it accepted the unrebutted statements of the postal police officers, and thus it had neither reason nor basis for making a credibility determination.

The record shows that the testimony of the postal police officers was inconsistent on several points. In his police report on the date of the incident, March 10, 1984, Officer Condon stated that when Mr. Smith attempted to leave Post 13 with the fur coat, he "instructed Mr. Smith to return to his work area and obtain a property pass". This report also states that both officers "pursued Mr. Smith and apprehended him outside the building" whereupon "Mr. Smith assaulted Officer Condon, by attempting to punch him."

In his court affidavit of March 26, 1984 Officer Condon does not state that he "instructed" Mr. Smith to go back and get a pass, but rather that two fellow postal employees entered the building and told Mr. Smith to go upstairs and get a pass. Although the March 10th report gave no indication that Mr. Smith was violent or uncooperative at this stage, Officer Condon now stated that Mr. Smith was "loud and abusive" and that "[h]e took off [his] coat and wanted to fight me." After Mr. Smith was apprehended, Officer Condon related that Mr. Smith "then attacked me and started swinging his arms at Sgt. Padro and myself".

At the Board hearing Officer Condon testified on direct that Mr. Smith "wanted to get into a fight with me over the contents of the bag" inside the building and that one employee entering the building told Mr. Smith to go back upstairs to get a property pass. On cross-examination, however, he admitted that there was no physical altercation inside the building, only verbal exchanges. With regard to the incident in the street, Officer Condon testified on direct as follows:

At that time Mr. Smith came back and ran past us with the coat out into 31st Street where we apprehended him in the street, pushed me up against the wall, knocked me up against the wall.

We placed him under arrest and we brought him along to the General Mail Office facility.

Q Did he swing at you?
A Yes, he did.
Q Did he hit you?
A No.

On cross-examination, Officer Condon stated:

I'll tell you what happened. When he ran outside, we had to stop him from running down the block. He was fighting us to get away. He threw the coat into the street and he tried to get away. He was pushing. He pushed me against the wall and he was swinging. That's what he did.

Q But when you arrested him?
A Yes.

Officer Condon stated that during this confrontation with Mr. Smith he did not draw his gun or nightstick, and that Mr. Smith was arrested on the sidewalk forty feet from the door of the building.

The second postal police officer, Officer Padro, testified on direct that:

I was talking to Mr. Condon and Mr. Smith came by through the door, pushed the door aside, and Officer Condon went outside after him and I spoke to Mr. Smith. I said "do you have a property pass for what you've got in your hand?" He told me he don't need one. Then I went outside with him and I asked him it's no sense for you to lose your job for the property pass. He started running. We stopped him. He turned around and took a swing. Then we put him against the wall and handcuffed him.

Q He was swinging at whom?
A He took a swing at Officer Condon.

On cross-examination Officer Padro testified that Mr. Smith was apprehended on the ramp approximately six feet from the door of the building. He repeated his earlier testimony that he had stopped Mr. Smith outside the building to ask him for a property pass, and stated that he had not been in any way assaulted. Concerning the in-

consistency with Officer Condon's earlier statements he stated:

I was on this side and he was on this side when he took a swing.

Q You just testified that Mr. Smith did not swing at you. Mr. Condon wrote in his factual report that he did. Which is true?

A When he took a swing Officer Condon got between me. That's what happened. He took a swing and Officer Condon got between me. Otherwise if he didn't come between me, I would have got the punch. I would have got hit.

Q You testified that he did not swing at you at all. This is what we're trying to establish.

A When he turned around and swung like this, I was on the opposite side. Condon came in between. Otherwise I would have got hit. That's why I say he took a swing at me. If Officer Condon didn't get in front of me I would have got hit.

The proposing official, Supervisor Daniels, conceded on cross-examination that he issued the Notice of Proposed Removal without contacting either of the security officers who were involved in the incident. Mr. Daniels also admitted that it was part of his job to investigate actually what had transpired. As it was, he accepted the security officers' stories without question.

If Officer Condon is believed, Mr. Smith ran out of the building with the officers in hot pursuit. Although he was "fighting to get away", swinging at both officers and pushing Officer Condon up against a wall, no police weapons were drawn. Significantly, nowhere in the record does Officer Condon relate that he and Officer Padro took the time to stop Mr. Smith and ask him to produce a property pass. Officer Padro, on the other hand, makes no mention of a violent struggle or that Officer Condon was pushed up against a wall. In Officer Padro's version, Mr. Smith was stopped and asked for a property pass. He then turned around and took *one* swing which was intercepted by Officer Condon. One wonders how Officer Condon could have imposed his body between Mr. Smith and Officer Padro when Mr. Smith had just pushed him up against a wall and Officer Padro was on the opposite side. Other inconsistencies are apparent. For example, was Mr. Smith apprehended on the sidewalk as Officer Condon testified or on the ramp as Officer Padro testified? Did the arrest occur forty feet or six feet from the postal facility doorway?

My point is not to make credibility determinations but simply to point out that the officers' testimony was not as consistent and unambiguous as the majority opinion would lead one to believe. Before the presiding official, Mr. Smith's version of the facts was supported by two witnesses, Messrs. Head and Vaughn. The presiding official discounted these accounts, stating that neither witness had viewed the entire incident and that she gave Mr. Vaughn's evidence less weight because it was not live testimony, Mr. Vaughn then being hospitalized.[5] There is a clear conflict between Officer Condon's testimony concerning Mr. Smith's flight from the building, capture, and immediate attack upon the police officers, and Messrs. Head's and Vaughn's testimony concerning several minutes of nonviolent conversation outside the building.

Had Mr. Smith been given the requisite pre-termination hearing, both Messrs. Head and Vaughn could have appeared personally before the agency in his defense and, however credibility was resolved at the agency level, there would have been an opportunity for the agency to consider mitigation of the penalty. As it was, the agency's decision to remove Mr. Smith, a decision to which the Board gives deference, *Douglas v. Veterans Administration*, 5 MSPB 313, 5 M.S.P.R. 280, 301–302 (1981), was reached by a plainly unfair process.

I do not reweigh the evidence: the only question before us is whether the errors in

5. Mr. Vaughn wrote this court a letter on February 1, 1986 to elaborate upon his affidavit testimony which he felt had been misinterpreted. This letter was not part of the record below and therefore is not considered by this court on appeal.

the process followed must be excused as "harmless". In my view, conducting a hearing in the absence of the accused can not be harmless error where, as here, the uncontroverted facts, as well as those requiring credibility determinations, were substantially different as presented to the agency and to the Board. It is simply inappropriate on this record to conclude, as does the majority, that the agency could not have reached a different result. The agency heard only unrebutted accusation, and on the facts then before it was surely less likely to consider reversal or mitigation then if the proper procedures had been followed and the accused had been allowed his minimum rights of response.

### IV.

The agency has not explained why a Step 1 hearing was not rescheduled under the circumstances of this case. Such action would have implemented the statute and the union agreement, and would have served both the employee, whose job was at stake, and the agency in its search for the truth.

In *Parker v. Defense Logistics Agency*, the Board held that a decisive factor in a harmful error analysis is whether the agency took steps to mitigate the effect of the error. 1 M.S.P.R. at 514. Mr. Smith testified before the presiding official that he attempted to reschedule the agency hearing but was rebuffed:

> I attempted to have a Step One hearing on April 18th because according to the proposal it stated that I had up to 14 days. However, I was denied access to the building and when I got the letter that Mr. Pellot wrote it stated that a Step One had been held on the 3rd. But I still went down on the 13th [sic: 18th] and tried to hold a Step One meeting. However, I was denied access to the building....
>
> Q Did you try and get in touch with Mr. Daniels?
>
> A Yes, I did. I tried to contact him on the 18th so that I could have a Step One hearing and 1 was denied access.
>
> Q Up until that point did you?

> A No. I sat down and tried to get my paperwork together and go forward. At the Step One Hearing I would have produced witnesses that was able to say exactly what happened. However, I was denied access to the building.

This testimony was uncontradicted. Nor did the agency cross-examine Mr. Smith on this point.

This testimony is consistent with the information in his MSPB notice of appeal, namely that he was appealing the agency's "refusal to give me a hearing on the 18th of April 1984" and that he had "requested Forman [sic] Daniels to allow me a hearing on 4–18–84 and he refused". In his petition for review to the Board Mr. Smith also stated that "[o]n 4–11 and 4–18–84 appellant attempted to respond to the charges and was rebuffed by Forman [sic] Daniels who stated that a Step One hearing had already been held."

Given this stone wall, locked out of his place of employment, Mr. Smith took his statutory appeal to the Board. It is hard for me to imagine what other recourse he could have or was required to have taken. Yet the majority now states that Mr. Smith was remiss in acting to preserve his right to the pretermination hearing, and thus somehow waived that right. I discern no basis in statute or law for that conclusion. The duty to provide an employee with timely notice of the charges and an opportunity to respond is assigned by law to the agency. When the agency received Mr. Smith's signed certified mail receipt of the Notice of Proposed Removal, it was made aware that it had prematurely issued a final decision. The agency took no action on its own to correct this violation, and denied Mr. Smith's request to do so.

The majority opinion suggests that Mr. Smith could have petitioned the agency for reconsideration, or sent a telegram, or otherwise pressed for a hearing, and holds that his failure to do so was a fatal flaw in his assertion of harmful error. I have been unable to find any postal service statute or regulation which enables the procedures urged by the majority. It is easy to sug-

gest that Smith should have done more than he did upon learning of the agency's error; but the correct measure is that of the reasonable person under the circumstances. The agency's notice stated that its decision was final and that Mr. Smith had "the right to appeal to the Merit Systems Protection Board immediately". It was not unreasonable for Mr. Smith to believe that the agency had decided his case, and that the Board was the requisite forum in which to seek redress of the agency's procedural violations. *See, e.g., Covington v. Department of Health and Human Services*, 750 F.2d 937, 944 (Fed.Cir. 1984) ("Congress has charged the Board with the job of protecting the procedural rights of federal employees."). Thus it was to the Board that Mr. Smith took his complaints, procedural as well as substantive. The Board failed to protect Mr. Smith's procedural rights, thus fatally tainting its decision on the merits.